# IN THE SUPREME COURT, STATE OF WYOMING

## 2016 WY 16

### OCTOBER TERM, A.D. 2015

February 2, 2016

BYRON NELSON GRIGGS,

Appellant
(Defendant),

v.

S-14-0200

THE STATE OF WYOMING,

Appellee
(Plaintiff).

***Appeal from the District Court of Sweetwater County***
The Honorable Richard L. Lavery, Judge

*Representing Appellant:*
> Office of the Public Defender:  Diane M. Lozano, State Public Defender; Tina N. Olson, Chief Appellate Counsel.  Argument by Ms. Olson.


*Representing Appellee:*
> Peter K. Michael, Wyoming Attorney General; David L. Delicath, Deputy Attorney General; Jenny L. Craig, Senior Assistant Attorney General; Caitlin F. Young, Assistant Attorney General.  Argument by Ms. Young.

*Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.**

**KAUTZ, Justice.**

[¶1]   A jury found Byron Nelson Griggs guilty of four counts of first degree sexual abuse involving two minors, and the district court sentenced him to life in prison without the possibility of parole because he had previously been convicted of a similar offense. On appeal, Mr. Griggs asserts the district court erred by rejecting his ineffective assistance of counsel claim, determining the child witnesses were competent to testify, admitting hearsay testimony from various witnesses, denying his request for a continuance, and admitting evidence under W.R.E. 404(b).   He also claims his constitutional right to a speedy trial was violated.

[¶2]   In most respects, the district court's rulings were correct.  The district court did err in allowing the admission of some of the hearsay testimony at trial; however, the errors were harmless under the circumstances of this case.  Consequently, we affirm.

## ISSUES

[¶3]   Mr. Griggs presents the following issues on appeal, which we rephrase and reorganize for a more efficient resolution:

    I.       Did the trial court err in finding the children competent to testify?

    II.      Did the Office of the State Public Defender, including trial counsel, provide ineffective assistance of counsel to Mr. Griggs because no expert witness was called to testify regarding the competency and alleged taint of the child witnesses?

    III.    Was Mr. Griggs denied his constitutional right to a speedy trial?

    IV.    Did the trial court abuse its discretion in denying Mr. Griggs' last motion for a continuance?

    V.     Did the trial court err in admitting hearsay testimony regarding the children's statements?

    VI.    Did the trial court err in allowing admission of evidence under W.R.E. 404(b) because the evidence was more prejudicial than probative?

The State presents the same issues, although they are phrased in greater detail.

## FACTS

1

[¶4]   In January 2012, the Department of Family Services (DFS) took RM's three children (sisters CM and SM and brother JM) into custody on allegations of neglect because their home was filthy and the children had chronic head lice.  The children were placed with foster parents, who also had other foster children in their care.

[¶5]   The foster family went camping in the summer of 2012, and one of the other foster children complained that CM was asking him to "share" his "pee-pee" with her.  Foster mother, TP, questioned CM about her behavior and CM revealed her mother's friend, "Byron," had shared his "pee pee" with her and SM.  In separate private conversations, TP asked SM and JM about their relationship with "Byron."  SM told TP that she had been sexually abused by him, and JM stated that he had watched "Byron" sexually abuse his sisters.

[¶6]   TP reported the conversations to DFS, who investigated the allegations.  During the investigation, RM identified "Byron" as Mr. Griggs and stated that she had an extramarital affair with him in 2011.  She also revealed that he watched the children while she went to a bar sometime in May or June of 2011.  A DFS investigator conducted forensic interviews of CM and JM, and a police detective interviewed SM.  The children reported that Mr. Griggs had put his "pee pee" in the girls' "butts" and licked their genitals.  At the time of the abuse, SM was four years old, CM was five years old, and JM was seven years old.

[¶7]   The State charged Mr. Griggs with four counts of first degree sexual abuse of a minor, under Wyo. Stat. Ann. § 6-2-314(a)(i) (LexisNexis 2015),[1] for inflicting cunnilingus and anal intercourse upon each girl.  Because Mr. Griggs had previously been convicted of attempted second degree sexual assault of a minor, he faced sentences of life without the possibility of parole under Wyo. Stat. Ann. § 6-2-306(e) (LexisNexis 2015).[2]

---

[1] Section 6-2-314(a)(i) states:

> (a) An actor commits the crime of sexual abuse of a minor in the first degree if:
> (i) Being sixteen (16) years of age or older, the actor inflicts sexual intrusion on a victim who is less than thirteen (13) years of age[.]

[2] Section 6-2-306(e) states:

> (e) An actor who is convicted of sexual abuse of a minor under W.S. 6-2-314 or 6-2-315 shall be punished by life imprisonment without parole if the actor has one (1) or more previous convictions for a violation of W.S. 6-2-302 through 6-2-304, 6-2-314 or 6-2-315, or a criminal statute containing the same or similar elements as the crimes defined by W.S. 6-2-302 through 6-2-304, 6-2-314 or 6-2-315, which convictions resulted from charges separately brought and which arose out of separate occurrences in this state or

2

[¶8]   The case went to trial more than a year after the charges were filed.  Several witnesses testified for the State, including CM, JM, RM, TP, a nurse practitioner who specialized in child abuse, and a forensic interviewer.  SM was called to testify at trial but was unable to answer any questions about the abuse.  An agent from the Department of Criminal Investigation (DCI) testified about the events surrounding Mr. Griggs' prior conviction of attempted second degree sexual assault.

[¶9]   The jury found Mr. Griggs guilty of all four counts, and the district court sentenced him to life in prison without the possibility of parole.  He filed a timely notice of appeal.

## DISCUSSION

### I.   Competence of Child Witnesses

[¶10]  Prior to trial, Mr. Griggs claimed the children were not competent to testify.  He also suggested their memories and testimony had been tainted by improper influences and interview techniques.  The district court held two hearings on the competency of the children.  The court questioned CM and SM separately at the first hearing and JM at the second hearing.  It issued detailed orders applying this Court's precedent regarding competency and declared all three children competent to testify.  We will restrict our analysis to the question of the girls' competency because, although Mr. Griggs occasionally refers to JM's mental deficiencies in his brief, he does not present a sufficient argument that JM was not competent to testify.  *See Boucher v. State,* 2011 WY 2, ¶ 32, 245 P.3d 342, 357–58 (Wyo. 2011) (refusing to consider "issues that are unaccompanied by cogent argument or citation to pertinent legal authority").

[¶11]  W.R.E. 601 provides that "[e]very person is competent to be a witness except as otherwise provided in these rules."  However,

> when children are called into the courtroom to testify, we have held that once the child's competency is called into question by either party, it is the duty of the court to make an independent examination of the child to determine competency, and that determination will not be disturbed unless shown to be clearly erroneous.

---

elsewhere and which convictions were for offenses committed after the actor reached the age of eighteen (18) years of age.

3

*English v. State,* 982 P.2d 139, 145 (Wyo. 1999) (internal citations and emphasis omitted). *See also Mersereau v. State,* 2012 WY 125, ¶ 5, 286 P.3d 97, 103 (Wyo. 2012). The trial court's determination is entitled to significant deference because it "is in a far better position to judge the demeanor, truth, and veracity of the witness[.]" *Gruwell v. State,* 2011 WY 67, ¶ 25, 254 P.3d 223, 231 (Wyo. 2011). In our review,

> "[w]e do not presume to place ourselves in the shoes of the trial court in these cases by reading a cold record. The trial court sees the witness' facial expressions, hears inflections in [his] voice and watches [his] mannerisms during examination. These observations are a vital part of the ultimate ruling on competency."

*Id.,* quoting *Seward v. State,* 2003 WY 116, ¶ 32, 76 P.3d 805, 819 (Wyo. 2003).

[¶12] Rule 601's statement that witnesses are generally competent to testify is "consistent with the modern philosophy that few persons are inherently incapable of testifying in some manner which is potentially useful." *Larsen v. State,* 686 P.2d 583, 585 (Wyo. 1984), citing 3 Louisell and Mueller, Federal Evidence § 250 (1979). In general, a witness is competent to testify if he can "'understand, receive, remember and narrate impressions and is sensi[tive] to the obligations of the oath taken before testifying.'" *Mersereau,* ¶ 6, 286 P.3d at 104, quoting *Simmers v. State,* 943 P.2d 1189, 1199 (Wyo. 1997). It is a witness's intelligence, not his age, that determines whether he is competent to testify. *Id.,* citing *Baum v. State,* 745 P.2d 877, 879 (Wyo. 1987). It goes without saying that a witness need not be perfect to be competent to testify. *See, e.g., Trujillo v. State,* 880 P.2d 575, 579 (Wyo. 1994) (although ten-year-old child's answers to certain questions were nonsensical, the district court did not err in finding him competent to testify).

[¶13] Wyoming uses a five-part test adopted in *Larsen,* 686 P.2d at 585, to determine a child witness's competence to testify. The district court must determine whether the child has:

> "(1) an understanding of the obligation to speak the truth on the witness stand; (2) the mental capacity at the time of the occurrence concerning which he is to testify, to receive an accurate impression of it; (3) a memory sufficient to retain an independent recollection of the occurrence; (4) the capacity to express in words his memory of the occurrence; and (5) the capacity to understand simple questions about it."

4

*Mersereau,* ¶ 7, 286 P.3d at 104, quoting *Larsen,* 686 P.2d at 585.

[¶14] Mr. Griggs claims the district court erred in concluding that CM and SM were competent to testify. SM did not actually testify at trial to any substantive information about Mr. Griggs, and, consequently, the relevance of the district court's determination as to her competency is questionable. Nevertheless, we will review the district court's rulings as to both girls.

[¶15] The first element of the *Larsen* test requires that the witness understand the obligation to speak the truth on the witness stand. The district court's order included the following findings and conclusions regarding CM's understanding of the obligation to tell the truth when testifying:

> [CM] was . . . able to explain that a lie is made up and not real, and the truth was not made up, was able to give examples of telling the truth and telling a lie, and promised to always tell the truth while she was on the witness stand. Later in the hearing, she also, without prompting, expressed an understanding that telling a story about someone that's not true is wrong, and could result in punishment, demonstrating an understanding of the obligation to speak the truth on the witness stand. The Court finds she has an understanding of the obligation to speak the truth on the witness stand.

[¶16] The record confirms the district court's ruling. When questioned about the distinction between telling the truth and a lie, CM stated that the truth was "not made up" and a lie was something that was "made up" and not real. She gave an example of a lie by saying the judge was a witness and an example of the truth by saying he was actually the judge. She stated that lying will result in punishment and is the wrong thing to do. The judge and CM also discussed the importance of telling the truth when testifying in court. Although CM did not know the meaning of an oath, the judge explained it to her and she indicated she understood the requirement of testifying truthfully after promising to do so in court.

[¶17] The district court discussed SM's understanding of her obligation to tell the truth on the witness stand as follows:

> S.M. was able to explain that a lie is something made up, and the truth is not made up, and gave an example. She expressed an understanding that she should tell the truth, not a

5

lie, that it is wrong to lie, and that if you lie, you get in trouble and get punished. She also promised to tell the truth. The Court finds she has an understanding of the obligation to speak the truth on the witness stand.

[¶18] The district court's findings are supported by the record. In response to questions from the district judge, SM stated that she knew what the truth was and distinguished it from a lie, which she described as something "made up." She then clarified that the truth was something that was "not made up." The judge asked her to give examples of the truth and a lie using colors of things in the courtroom and she did so. SM stated that it is "wrong" to tell a lie. She stated that she would "get in trouble" if she told a lie and would be punished with a "time out" for doing so. As with CM, the judge discussed the process of taking an oath in court, and SM indicated that she could raise her hand and promise to tell the truth and then testify in accordance with her promise.

[¶19] Mr. Griggs claims the district court's decisions regarding the first *Larsen* factor were incorrect because the record does not show that the girls understood their moral obligation to tell the truth. Other than quoting from a Florida case, *Seccia v. State,* 689 So.2d 354, 356 (Fla. Ct. App. 1997) (citation omitted), which stated that, in order to be considered competent to testify, a child must demonstrate "a moral obligation or sense of duty to be truthful," Mr. Griggs does not explain his theory with regard to the "moral obligation" or how the record reflects that the girls did not understand the obligation. In fact, contrary to Mr. Griggs' assertions, the record shows that the girls understood the difference between the truth and a lie and appreciated the duty to tell the truth in court. They knew it was wrong to lie.

[¶20] The district court analyzed the remaining *Larsen* competency factors together, which is understandable considering many of the questions posed to the girls addressed more than one factor. The district court's order stated the following regarding CM's responses at the competency hearing:

> C.M. is seven years old. She knows her age, birthday, how many months in a year and what the months are. She is intelligent enough to, for example, know the values of money, recall her parents' telephone numbers, and perform simple mathematics, such as addition and subtraction of single-digit and low two-digit numbers. Her ability to recall specific times is limited, but age appropriate. She was able, for example, to recall things important to her, such as what gifts she received for her last birthday, and significant events in her life, such as her family having to move out of their old house,

and that she was living in foster care, not with her mother, at Christmas, but was living with her mother in Rock Springs last summer. She was also able to describe the layout of the home she lived in with her mother. The Court finds she had the mental capacity at the time of the occurrence to receive an accurate impression of it, and has enough present memory of that time period, capacity to understand simple questions, and ability to express her memory to be a reliable witness.

[¶21] The district court's findings address each of the remaining *Larsen* factors on CM's competency, and Mr. Griggs does not expressly challenge them. However, he claims CM was not competent because she was unable to answer other questions at the hearing. For example, she did not know the number of days in a month, although she knew there were twelve months in a year. She did not know what state she lived in, but she knew she lived in the town of Green River.

[¶22] CM had also forgotten certain things including her kindergarten teacher's name (she had repeated kindergarten and was in first grade at the time of the hearing), what she received for Christmas the year before, and the date she had last lived with her parents. In fact, she conceded that she "forget[s] sometimes." However, CM remembered other things, such as what she received for her birthday the year before, the town where she went to church when she lived with her biological mother, her siblings' birthdays, her mother's telephone number, how many teeth she had lost, that she had gone to kindergarten twice because she "didn't listen the first time," that she had taken medicine so she would not get car sick when she went camping with her "mom and dad," her dad had taught her how to swim, and what she had done for fun the last summer she lived with her mother, i.e., the summer the abuse took place.

[¶23] CM's answers, on the whole, demonstrated that she had the mental capacity and memory to recall events and information which were related to the time of the abuse, understand simple questions about the occurrence, and express in words her memory of the occurrence. Given the district court's ruling on competency is entitled to deference and its findings are supported by the record, we conclude the district court did not err when it found CM competent to testify after the pretrial hearing.

[¶24] Mr. Griggs points to several inconsistencies in CM's trial testimony and suggests they demonstrate the district court's pretrial ruling on her competency was clearly erroneous. We addressed a similar argument in *Hutchinson v. State,* 2012 WY 155, ¶ 10, 290 P.3d 174, 178 (Wyo. 2012), and recognized that, by the time the victim testified at trial, she had already been declared competent. The same is true here. Furthermore, Mr. Griggs' concerns about CM's trial testimony have more to do with her credibility and the

weight to be accorded her testimony than her competence to testify. *See, e.g., Watters v. State,* 2004 WY 155, ¶ 18, 101 P.3d 908, 916 (Wyo. 2004); *Sisneros v. State,* 2005 WY 139, ¶ 37, 121 P.3d 790, 802 (Wyo. 2005). Mr. Griggs' defense counsel challenged CM's inconsistent testimony through cross examination at trial.

[¶25] The district court also found SM satisfied the final four *Larsen* factors:

> S.M. is six years old. She knows her age, birthday, and the days of the week, and is able to spell some short words. She seems to have somewhat greater natural intelligence than C.M.; she was able to understand not only living in Rock Springs or Green River, but also that both places are in the State of Wyoming. She was able to recall living with her mother before living with her foster mother, and visiting her mother in her mother's new house after she began living with her foster mother. She also recalled some details about the appearance of her mother's old house, and remembered what she received for her last birthday. And she remembered events of significance in her life, such as moving to foster care when she started school last autumn, as well as camping with her family last summer and catching a big fish. The Court finds she had the mental capacity at the time of the occurrence to receive an accurate impression of it, and has enough present memory of that time period, capacity to understand simple questions, and ability to express her memory to be a reliable witness.

[¶26] Like with CM, Mr. Griggs does not challenge the district court's specific findings about SM's answers to its questions, but points out other instances where her answers were not correct. Most of the mistakes in SM's testimony had to do with the duration of time periods, such as the amount of time she had been in foster care and when she moved out of her biological mother's home. Those questions involved abstract concepts about the passage of time, rather than the ability to recall specific events. Consequently, they were not directly relevant to the *Larsen* competency factors. The record supports the district court's findings about SM's testimony at the competency hearing and its decision that she had sufficient mental capacity to receive accurate impressions of the sexual abuse, a memory sufficient to retain an independent recollection of the occurrence, the capacity to express in words her memory of the occurrence, and the capacity to understand and answer simple questions about it.

[¶27] Mr. Griggs claims this case is very similar to *Mersereau* in which we concluded the district court's ruling that the victim was competent to testify was clearly erroneous. Although the victim in *Mersereau* distinguished between the truth and a lie when the district court asked direct questions about whether something was true or false, the evidence did not demonstrate that he understood the obligation to tell the truth while testifying in court. In addition, the victim testified to information about his family members and pets he knew was untrue. The victim's incorrect testimony continued even after being reminded by the district court that he needed to tell the truth. We also had significant concern that the victim's imagination regarding his non-existent pets was intertwined with his testimony about the alleged sexual abuse. *Mersereau,* ¶¶ 9-12, 286 P.3d at 104-05.

[¶28] The case at bar is much different. Unlike in *Mersereau,* the district court specifically questioned the girls about their understanding of the obligation to tell the truth while on the witness stand. Although the girls may have been incorrect about certain matters when they testified at the competency hearing, they were not testifying to matters they knew were untrue. They were simply mistaken. Furthermore, there is no indication that the girls' memories or testimony about the events were intertwined with clearly untrue testimony or memories. As we stated, above, witnesses (child or adult) need not be perfect in order to be deemed competent to testify. It is, after all, the jury's duty to determine the credibility of a witness. *Watters,* ¶ 18, 101 P.3d at 916.

[¶29] Our prior cases demonstrate that a witness may be mistaken on certain matters and still be competent to testify. In *Hutchinson*, we upheld the district court's finding that the child victim was a competent witness because she could recall where she lived, who she lived with, her pets, and her friends' names at the time of the incident, even though she could not accurately tell the court how long ago it occurred or what she had told her brother when she reported the incident to him. *Id.,* ¶¶ 10-12, 290 P.3d at 177-78. In *Sisneros*, ¶¶ 34-39, 121 P.3d at 801-02, we recognized that, although some of the victim's statements about the obligation to tell the truth were troubling when taken in isolation, "the district court was charged with determining whether or not [the victim] was competent to testify based upon the entirety of her testimony." We noted that concerns about the witness's credibility could properly be tested on cross examination. *See also Ryan v. State,* 988 P.2d 46, 58 (Wyo. 1999) ("That [the child witness's] memory proved fallible on one point does not demonstrate the absence of an independent recollection").

[¶30] We turn now to Mr. Griggs' argument regarding taint. He claims the children's recollection and testimony were tainted by various adults and suggests the district court should have conducted a separate taint hearing. In *English,* 982 P.2d at 146, we ruled that "there must be a showing of at least 'some evidence' that the victim's statements were the product of suggestive or coercive interview techniques before a 'taint hearing'

9

must be granted." *English,* 982 P.2d at 146, citing *State v. Michaels,* 642 A.2d 1372, 1383 (N.J. 1994). *See also Ryan,* 988 P.2d at 58. The issue of taint does not have to be addressed at a separate hearing but can usually be adequately tested under the third factor of the *Larsen* test − "a memory sufficient to retain an independent recollection of the occurrence." When there is a specific allegation of taint, the analysis of the third competency element should be expanded, as follows:

> The factors that should be considered in assessing the reliability of a complaint regarding sexual offenses are: "(1) the age of the victim; (2) circumstances of the questioning; (3) the victim's relationship with the interrogator; and (4) the type of questions asked." * * * Undue suggestiveness can occur when an interviewer has a preconceived notion of what has happened to a child, the interviewer uses leading questions, the interviewer is a trusted authority figure, the person accused of wrongdoing is vilified during the interview, or the interviewer uses threats or rewards to pressure the child.

*English,* 982 P.2d at 146 (citations omitted).

[¶31] The district court did not consider taint at the competency hearings. It told the parties that, if a taint issue came to light after defense counsel had an opportunity to consult with his expert, they would discuss it later. Defense counsel agreed to that procedure.

[¶32] On appeal, Mr. Griggs suggests that a taint inquiry was requested by defense counsel but does not include a record cite to support that assertion.[3] We have not located any specific request for a taint hearing in the record. The closest defense counsel came to requesting a more detailed analysis of the taint issue was during the April 23, 2013 hearing on the girls' competence. The district judge questioned CM and then asked the attorneys if they wanted him to ask any additional questions. Defense counsel suggested that "maybe" the court "could ask [CM] if anyone has talked to her about the event."

[¶33] The district court did not directly address that "request." In fact, it did not question the children about the charged event at all. In *Gruwell*, ¶ 20, 254 P.3d at 229-30, we stated that a district court is not required to question a child witness at a

---

[3] Mr. Griggs' claim is somewhat curious given he argues in a later section of his brief that defense counsel was ineffective for failing to "request a taint hearing or a supplemental competency hearing to address issues of taint."

10

competency hearing about "her recollection or understanding of the particular events at issue." Thus, the district court acted within its discretion at the competency hearing by declining to question CM about the allegations against Mr. Griggs. Given the defense did not specifically request a taint hearing or formally present "some evidence" of taint prior to trial, the district court was not required to conduct a more in-depth investigation into whether the children were subjected to suggestive or coercive interview techniques.

[¶34] Convicting a defendant upon the testimony of young children always presents serious concerns. As we have previously explained,

> "[t]wo alternative hazards are confronted. On the one hand, in accepting the testimony of a child there is the danger that she may not be telling the truth, in which event an innocent man may be convicted of crime and suffer the consequences thereof. On the other, if the child's testimony is not accepted, a man guilty of crime, and possibly with the potential for more such, will go free. In this connection, it must be borne in mind that when such an offense [assaulting and taking indecent liberties upon a child] is committed, it is done with the greatest possible stealth and secrecy, so that most often the testimony of the victim, coupled with the type of corroboration we have here, is the only evidence available upon which to determine guilt or innocence. The fact that there are difficulties involved should not prevent the processes of justice from functioning." *State v. Smith,* 16 Utah 2d 374, 401 P.2d 445, 447 (1965).

*Larsen,* 686 P.2d at 585-86.

[¶35] In this case, the district court conducted the required analysis to protect the interests of the children and Mr. Griggs. Its competency decisions are entitled to substantial deference because it "is in a far better position to judge the demeanor, truth, and veracity of the witness[.]" *Gruwell,* ¶ 25, 254 P.3d at 231. The record supports the district court's decision that the *Larsen* factors were satisfied; consequently, the district court's rulings that CM and SM were competent to testify were not clearly erroneous.

## II. Ineffective Assistance of Counsel

[¶36] A criminal defendant's right to effective assistance of counsel is guaranteed by the Sixth Amendment to the United States Constitution and art. 1, § 10 of the Wyoming Constitution. To prevail on a claim of ineffective assistance of counsel, the defendant

11

must show his trial counsel's performance was deficient and the attorney's deficient performance prejudiced his defense. *Cooper v. State,* 2014 WY 36, ¶¶ 19-20, 319 P.3d 914, 920 (Wyo. 2014); *Osborne v. State,* 2012 WY 123, ¶ 19, 285 P.3d 248, 252 (Wyo. 2012); *Strickland v. Washington,* 466 U.S. 668, 690-91, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To establish counsel's performance was deficient, the defendant must show that "counsel failed to render such assistance as would have been offered by a reasonably competent attorney." *Cooper,* ¶ 19, 319 P.3d at 920. We explained in *Lower v. State,* 786 P.2d 346, 349 (Wyo. 1990):

> To warrant reversal on his claim of ineffective assistance of counsel, appellant must demonstrate some deficiency in the representation received from his attorney. Counsel must have failed, in light of all circumstances existing at the time of the challenged act or omission, to employ such judgment or to render such assistance as would have been offered by a reasonably competent attorney under like circumstances.

The defendant must also demonstrate that he was prejudiced by defense counsel's deficient performance. Prejudice is established if "a reasonable probability exists that, but for counsel's deficient performance, the outcome would have been different." *Osborne,* ¶ 19, 285 P.3d at 252.

[¶37] After filing his notice of appeal, Mr. Griggs requested, pursuant to W.R.A.P. 21, that we remand to the district court for a hearing on his claim that he received ineffective assistance from trial counsel. *See generally Calene v. State,* 846 P.2d 679 (Wyo. 1993) (first addressing the remand procedure for ineffective assistance of counsel claims). We granted his motion, and the district court held an evidentiary hearing and concluded Mr. Griggs had received effective assistance of trial counsel. Review of a trial court's ruling on an ineffective assistance of counsel claim involves mixed questions of law and fact. *Osborne,* ¶ 17, 285 P.3d at 252. "We defer to the district court's findings of fact unless they are clearly erroneous." *Cooper,* ¶ 20, 319 P.3d at 920, citing *Strandlien v. State,* 2007 WY 66, ¶ 20, 156 P.3d 986, 992 (Wyo. 2007). The district court's "conclusions of law, which include the question of whether counsel's conduct was deficient and the question of whether the appellant was prejudiced by that deficient conduct," are reviewed *de novo. Strandlien,* ¶ 20, 156 P.3d at 992, quoting *Robinson v. State,* 2003 WY 32, ¶ 16, 64 P.3d 743, 748 (Wyo. 2003).

[¶38] Mr. Griggs claims his trial counsel's performance was deficient because he did not retain an expert to testify at the competency hearing or at trial, although he did retain an expert, Dr. Vickie Gregory, who assisted with trial preparation. "When an ineffective

12

assistance claim is based upon the failure to call an expert witness, the defendant must show an expert was available who would have testified consistently with his theory." *Cooper,* ¶ 22, 319 P.3d at 920. Those questions are often dispositive in the analysis. However, even if there is an expert available who will testify consistent with a theory of defense, the defendant must also show that his counsel did not act as a reasonably competent attorney in determining whether expert testimony was necessary under the specific circumstances of the case and/or how to use the expert's services. *See id. See also Thompson v. Belleque,* 341 P.3d 911, 922 (Or. Ct. App. 2014) (stating "[a]mong the universe of reasonable tactical decisions is the decision not to present expert evidence").

[¶39] A reasonably competent attorney may use an expert witness in a variety of ways, including as a consultant in areas of specialized knowledge, for review of the facts of a case, to formulate trial strategy, to develop questions for cross examination of the State's witnesses, as an expert witness at court hearings or trial, etc. An attorney is not necessarily ineffective because he decides that an expert's assistance in trial preparation is sufficient and that the expert's testimony at trial is not necessary. Other courts have specifically rejected ineffective assistance of counsel claims where defense counsel reasonably chose to use an expert to prepare to cross examine the government's witnesses rather than having the defense expert testify at trial. *See, e.g.*, *Rice v. State,* 733 S.E.2d 755, 772 (Ga. 2012); *Brown v. United States,* 384 A.2d 647, 649 (D.C. Ct. App. 1978) (consultation with expert for cross examination in lieu of calling expert to testify was not ineffective assistance of counsel). The task of the court in reviewing the adequacy of defense counsel's representation will be to determine whether defense counsel reasonably analyzed the options and decided on an appropriate course of action. *See, e.g.*, *Cooper, supra*; *Lopez v. State,* 2004 WY 28, 86 P.3d 851 (Wyo. 2004).

[¶40] In *Cooper,* the defendant was convicted of aggravated assault by threatening to use a drawn deadly weapon. He claimed he was acting in self defense when he fired two shots at the victim who was driving toward him in a car. We held that defense counsel did not provide constitutionally adequate assistance when she chose to rely on cross examination of the State's witnesses to establish the distance between the defendant and the car when the shots were fired. At the post-trial evidentiary hearing on defendant's ineffective assistance of counsel claim, an expert testified that the car was so close when the defendant fired the shots that his hand was actually over the hood. It is important to note that we did not say that cross examination of the State's expert in lieu of employing an expert is always improper or that an expert could not be used in ways other than appearance at trial. However, under the circumstances in *Cooper,* counsel's efforts were ineffective because the jury was never informed that the car may have been so close when the defendant fired the shots. *Id.,* ¶ 33, 319 P.3d at 922-23. *See also Lopez,* ¶¶ 27, 33-34, 86 P.3d at 859, 861 (defense counsel's efforts to obtain an expert witness to testify about the victim's cause of death were ineffective because the potential expert reviewed

the medical records for only one hour before accepting the State's theory and other experts identified evidence that the defendant's action was not the cause of death).

[¶41] In other cases, we have concluded that defense counsel's failure to call an expert witness to testify at trial did not constitute ineffective assistance. In *Anderson v. State,* 2014 WY 13, ¶¶ 45-48, 317 P.3d 1108, 1123-24 (Wyo. 2014), we ruled that, even though an expert witness was available and could have testified consistent with a theory of defense, defense counsel properly decided not to call the expert because the facts of the case undermined the validity of the defense. *See also Osborne,* 2012 WY 123, 285 P.3d 248 (Wyo. 2012) (defense counsel was not ineffective for failing to call an expert to testify at trial even though one was available who would testify consistent with defendant's voluntary intoxication defense because other facts of the case demonstrated the defendant was able to act lucidly despite his ingestion of intoxicating substances).

[¶42] Much of the remand hearing evidence and Mr. Griggs' argument on appeal center on the problems his trial counsel may have had with obtaining funding through the State Public Defender's Office for his expert witness. He argues that the State Public Defender's Office's failure to adequately fund an expert witness to testify at trial or other court hearings amounted to deficient representation. We will not delve into the internal workings of the State Public Defender's Office. While trial counsel's requests for expert funding, the state office's responses to those requests, the timing of the communications, etc. may be interesting, our precedent places the focus upon whether defense counsel's actual actions or omissions violated Mr. Griggs' constitutional right to effective assistance of counsel. *See Lower,* 786 P.2d at 349.

[¶43] Mr. Griggs' defense was that the children were not reliable witnesses, had fabricated the story of the abuse, and had been improperly influenced. He asserts that Dr. Vickie Gregory, an expert in forensic interviews of child abuse victims, was available to testify at the competency hearings, a separate taint hearing or at trial, and her testimony would have supported his theory of defense. Dr. Gregory was not retained prior to the girls' competency hearing; consequently, she did not advise defense counsel prior to the hearing or testify at it. At the remand hearing on the effectiveness of counsel, Dr. Gregory testified that she reviewed the police reports, DFS records, recordings of the children's forensic interviews, the children's medical records, counseling and therapy notes, the foster mother's interview, transcripts of the competency hearings, transcripts of the trial, and the court's order on the children's competency. She outlined some concerns about JM's competence, but stated that she was more troubled about the girls' competence. Given Mr. Griggs does not argue on appeal that the district court erred by finding JM competent to testify and SM did not provide any substantive testimony at trial, we will confine our analysis to defense counsel's performance at CM's competency hearing.

[¶44] At the remand hearing, Dr. Gregory raised several concerns about CM's competency, including: 1) the effect of her young age on memory and her understanding of the moral obligation to tell the truth; 2) her intellect; 3) the fact that she had been diagnosed with Attention Deficit Hyperactivity Disorder (ADHD); and 4) errors in the interviewing techniques. The district court noted that "[e]vidence about [the children's] cognitive or developmental issues was not presented at their competency hearings, nor was evidence about the interviewing techniques used by the forensic interviewers." General concerns about CM's young age and its effect on memory and the obligation to tell the truth and her intellect were, however, addressed at the competency hearing.

[¶45] With regard to what Dr. Gregory could have added to the hearing, the district court stated:

> At the competency hearings, the Court did not have Dr. Gregory's testimony about the developmental delays or psychiatric diagnoses of the children. On the other hand, the Court had the opportunity to observe the children firsthand. The Defendant specifically notes that CM and JM were exposed to alcohol in utero and had below average IQ[s], and CM had repeated kindergarten. [In a footnote, the district court stated that "CM testified at the competency hearing that she had repeated kindergarten."]. Consequently, they were still within the first stage of moral reasoning. This information was not explored at the competency hearing.
>
> On the other hand, at the competency hearing, the Court observed that the children were highly energetic – a handful, to say the least. The experience of being before the Court in a relatively informal setting, i.e. without the crowd of observers, jurors, and other court personnel present, gave the children more opportunity to act out. On several occasions, the Court and counsel were called upon to gently instruct the children to behave while on the witness stand. The Court has its own experience with children. The Court could fully recognize that these two children [CM and SM] were not at the top of their class. While the Court did not have their diagnoses, it was fairly easy to determine, in observing their disposition and demeanor, that there were things lacking in their development and education, but they had the capacity to understand, remember and understand

15

they needed to tell the truth. To wit, they exceeded the minimum threshold to be competent to testify.[4]

[¶46] As we stated above, in analyzing the first prong of the effectiveness test, the court must determine not only whether an expert who would testify consistent with the defense theory was available but also whether reasonably competent counsel would have necessarily had the expert testify at the hearing. As the district court recognized, Dr. Gregory could have presented evidence at the competency hearing that CM had been diagnosed with ADHD. However, defense counsel's failure to present that testimony is of little concern because the district court was aware that CM had traits consistent with the diagnosis. Dr. Gregory described the characteristics of children with ADHD: "They have a high energy level, they move around a lot, they have trouble sitting still, they interrupt, they don't answer questions easily back and forth because they interrupt, they're easily distracted, they don't listen, they tend to be impulsive and blurt things out. . . . They're a handful, basically."

[¶47] The district court was keenly aware from CM's testimony and behavior at the hearing that she had developmental, intellectual and behavioral issues. The evidence of a particular diagnosis would not, without some specific correlation between the witness and the *Larsen* factors, have changed the competency determination. Under the circumstances of this case, a reasonably competent attorney would not have necessarily determined that the testimony of an expert at the competency hearing was necessary to point out what was obvious to the judge.

[¶48] Dr. Gregory's testimony about the problems with how the children were questioned by various adults, including the forensic interviewer, the nurse practitioner and foster mother, pertained to whether their testimony was tainted. The district judge made it very clear at the competency hearing that he was not going to specifically address taint and that, if the defense wanted the court to further examine that issue prior to trial, it should request a supplemental hearing. Thus, the expert's proposed testimony about the flawed interviews was not even an issue at the competency hearing. Under these circumstances, defense counsel did not perform deficiently by not having Dr. Gregory testify at the competency hearing.

---

[4] The district court made these observations when it analyzed the prejudice prong of the ineffective assistance of counsel analysis. Nevertheless, the district court's findings are relevant to a determination of whether defense counsel's performance was deficient.

16

[¶49] Mr. Griggs also suggests that his defense counsel was deficient for failing to request a taint hearing and have Dr. Gregory testify at it. However, he did not present any evidence at the remand hearing establishing that a separate taint hearing was necessary. Dr. Gregory testified at the remand hearing that she could not remember whether she advised defense counsel that a taint hearing was needed. Trial counsel testified that he could not remember if Dr. Gregory told him that there were issues of taint that needed to be addressed in a pretrial hearing. When asked why he did not request a taint hearing, he stated: "[I]n my conversations with Dr. Gregory, . . . nothing in my memory jumps out as saying, hey, we need to go out and do that." Instead, defense counsel described how he used Dr. Gregory's advice to address the possibility of taint or improper influence by cross examination of the State's witnesses at trial.

[¶50] We have stated that "evidence of suggestive questioning or coercive pretrial interviews goes to the credibility or reliability of a witness rather than to the admissibility of testimony, and that such is a matter more properly addressed to the jury during cross-examination or by introducing contradictory evidence or expert testimony." *Peterson v. State,* 2012 WY 17, ¶ 21, 270 P.3d 648, 655 (Wyo. 2012), citing *State v. Smith,* 225 W.Va. 706, 696 S.E.2d 8, 14–15 (W.Va. 2010); *State v. Bumgarner,* 219 Or. Ct. App. 617, 184 P.3d 1143, 1151–52 (Or. Ct. App. 2008). There is no evidence in this case that addressing taint through cross examination at trial was not a reasonable strategy or that a reasonably competent attorney would have requested a separate taint hearing and then called Dr. Gregory to testify at such a hearing.

[¶51] Mr. Griggs also claims that defense counsel was deficient for not having Dr. Gregory testify at trial. As we stated above, reasonably competent defense counsel may use an expert in a variety of ways. In this case, defense counsel retained Dr. Gregory to review the relevant materials, with a focus on the forensic interviews of the children and the possibility the children's recollections were tainted. She reviewed the evidence and provided defense counsel with research-based information about interview techniques, attributes and behaviors of children, and the effects of improper influences and interview techniques on children's testimony. Dr. Gregory consulted with defense counsel prior to and during the trial to formulate questions to cross examine the State's expert witness, the children and the adults who questioned the children about the abuse.

[¶52] Dr. Gregory stated at the remand hearing that she could have testified at trial about: the traits of the children that affected the reliability of their memories and testimony; problems with the techniques the various adults used to question the children; and her critiques of the State's expert, including her disagreement with the expert's statements regarding the percentage of victims who report child sexual abuse and the reasons, other than sexual abuse, that cause children to act out inappropriately.

[¶53] Dr. Gregory's observations, and thus her potential testimony, were not tangibly different from evidence developed by defense counsel through cross examination of the State's witnesses, which he formulated with the assistance of Dr. Gregory. The jury saw for itself that the children were young and their memories were not perfect. On cross examination, defense counsel questioned CM and JM about whether they had been instructed on what to say about the abuse.

[¶54] Defense counsel also established through cross examination of the foster mother, the forensic examiner and the nurse practitioner that the children may have been subjected to suggestive or otherwise improper questioning about the abuse. He questioned the biological mother about coaching the children, although there is no indication in the record that she told them to say anything that would implicate Mr. Griggs.

[¶55] Defense counsel thoroughly cross examined the State's expert, Hollie Strand, about forensic interviewing protocol and the possible consequences of suggestive or improper interviewing techniques on a child's account of abuse. She also testified that certain child behaviors are not necessarily indicative of sexual abuse but may simply suggest that the child had experienced some type of trauma or stress. Given that defense counsel essentially covered the same ground through cross examination that he would have with Dr. Gregory's testimony, Mr. Griggs has not demonstrated that defense counsel was deficient for failing to call her to testify at trial.

[¶56] While it is unnecessary for us to consider the prejudice prong of the test for ineffective assistance of counsel, we note that many of the bases for concluding defense counsel was not deficient also support a finding that Mr. Griggs was not prejudiced by counsel's performance. In addition, the prosecution's evidence against Mr. Griggs was very strong. CM's initial disclosure of the abuse was occasioned by her inappropriate request that another child share his "pee pee" with her. Her identification of Mr. Griggs as the person who taught her such behavior was spontaneous and without prompting. The other two children told essentially the same story, and the children's statements about the abuse never changed in any significant way. There is simply no reasonable probability that the result of the trial would have been different if Dr. Gregory had testified. *Osborne,* ¶ 19, 285 P.3d at 252. Mr. Griggs has not demonstrated that his constitutional right to effective assistance of counsel was violated in this case.

## III. Speedy Trial

[¶57] Mr. Griggs claims the district court violated his right to a speedy trial under the Sixth Amendment to the United States Constitution.[5] We review this issue *de novo*. *Durkee v. State,* 2015 WY 123, ¶ 10, 357 P.3d 1106, 1110 (Wyo. 2015); *Berry v. State,* 2004 WY 81, ¶ 17, 93 P.3d 222, 227-28 (Wyo. 2004).

[¶58] The Sixth Amendment states, in relevant part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial[.]" *See also* Wyo. Const. art. 1, § 10. The State is required to provide a prompt trial; therefore, it has the burden of proving delay in bringing a defendant to trial was reasonable and necessary. *Durkee,* ¶ 12, 357 P.3d at 1111. *See also Harvey v. State,* 774 P.2d 87, 92, 95 (Wyo. 1989); *Dickey v. Florida,* 398 U.S. 30, 37–38, 90 S. Ct. 1564, 26 L. Ed. 2d 26 (1970). "The ultimate question is 'whether the delay in bringing the accused to trial was unreasonable, that is, whether it substantially impaired the right of the accused to a fair trial.'" *Berry,* ¶ 31, 93 P.3d at 231, quoting *Warner v. State,* 2001 WY 67, ¶ 10, 28 P.3d 21, 26 (Wyo. 2001) (other citations omitted).

[¶59] The test set forth by the United States Supreme Court in *Barker v. Wingo,* 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972), governs claimed violations of the constitutional right to a speedy trial. *Cosco v. State,* 503 P.2d 1403, 1405 (Wyo. 1972). Under *Barker,* the Court considers four factors: the length of the delay; the reason for the delay; the defendant's assertion of his right; and the prejudice to the defendant." *Berry,* ¶ 31, 93 P.3d at 230-31, citing *Harvey,* 774 P.2d at 92. *See also Ortiz v. State,* 2014 WY 60, ¶ 39, 326 P.3d 883, 893 (Wyo. 2014). The factors are considered together and balanced in relation to all relevant circumstances, with no individual factor being dispositive. *Durkee,* ¶ 11, 357 P.3d at 1111; *Ortiz,* ¶ 39, 326 P.3d at 893.

## A. Length of Delay

[¶60] Under the constitution, the speedy trial clock begins to run at the earlier of arrest or the filing of an information or indictment and stops when the trial begins. *Ortiz,* ¶ 40, 326 P.3d at 893; *Berry,* ¶ 32, 93 P.3d at 231. "No precise length of delay automatically constitutes a violation of the right to a speedy trial." *Berry,* ¶ 32, 93 P.3d at 231. If the delay is sufficiently long, analysis of the other three factors is required. *Mascarenas,* ¶ 12, 315 P.3d at 661, citing *Berry,* ¶¶ 32–34, 93 P.3d at 231–32.

---

[5] Mr. Griggs does not argue his right to a speedy trial under W.R.Cr.P. 48 was violated, so we limit our analysis to the constitutional question. *See Durkee v. State,* 2015 WY 123, ¶ 11 n.1, 357 P.3d 1106, 1110 n.1 (Wyo. 2015); *Mascarenas v. State,* 2013 WY 163, 315 P.3d 656 (Wyo. 2013) (conducting a constitutional analysis without considering Rule 48 because the appellants asserted only Sixth Amendment violations on appeal).

[¶61] Four hundred eleven days passed between the State's filing of charges against Mr. Griggs on June 28, 2012, and trial on August 13, 2013. Under our precedent, this length of delay is sufficiently long to trigger analysis of the other three *Barker* factors. *See, e.g., Mascarenas,* ¶ 12, 315 P.3d at 661 (332 day delay warranted further analysis); *Fortner v. State,* 843 P.2d 1139, 1145 (Wyo. 1992) (276 day delay triggered further analysis); *Caton v. State,* 709 P.2d 1260 (Wyo. 1985) (204 day delay triggered further analysis).

## B. Reasons for Delay

[¶62] Next, we consider the reasons for the delay and which party was responsible for each period of delay. The delays caused by the State are weighed against those caused by the defendant. The defendant is responsible for "'delays attributable to changes in defense counsel, to the defendant's requests for continuances, and to the defendant's pretrial motions.'" *Ortiz,* ¶ 42, 326 P.3d at 893, quoting *Miller v. State,* 2009 WY 125, ¶ 40, 217 P.3d 793, 805 (Wyo. 2009). All delays that are not attributable to the defendant are assigned to the prosecution because the State has the responsibility to try the defendant promptly. *See Durkee,* ¶ 16, 357 P.3d at 1112.

[¶63] Mr. Griggs' preliminary hearing was initially scheduled for July 3, 2012. Mr. Griggs filed several requests with the circuit court for continuances of the preliminary hearing because he changed defense counsel twice and the attorneys needed to prepare for the hearing. His preliminary hearing was finally held on December 18, 2012, and he was bound over to the district court on all charges. A defendant is responsible for delays associated with his changes of counsel and defense motions for continuances. *Ortiz*, ¶ 42, 326 P.3d at 893. Therefore, the 168 days between the original preliminary hearing date of July 3, 2012, and when it was finally held on December 18, 2012, are attributed to Mr. Griggs.

[¶64] Trial was set for May 13, 2013. After the pretrial conference on April 22, 2013, the trial date was changed to June 17, 2013. It appears that the district court continued the trial from May to June because of its court schedule. Continuances caused by a district court's crowded docket are attributed to the State. *Berry,* ¶ 26, 93 P.3d at 232. Mr. Griggs moved to continue the June trial setting to give him more time to obtain an expert. He also waived his right to a speedy trial at that time. The district court granted the continuance and the trial commenced on August 13, 2013.

[¶65] The delays directly attributable to the defendant's changes of counsel and requests for continuances add up to 224 days, which is over half of the 411 day total. The State is responsible for the remaining 187 day delay. Delays allocated to the prosecution are analyzed using the following analysis:

> A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witnesses, should serve to justify appropriate delay. *Wehr v. State,* 841 P.2d 104, 112–113 (Wyo.1992), quoting *Barker.*

*Berry,* ¶ 36, 93 P.3d at 232. There is no allegation that the State deliberately attempted to delay the trial in order to hamper the defense. As such, although the State is charged for the 187 days, the reasons are essentially neutral.

[¶66] Mr. Griggs asserts that although the defense bears the bulk of the responsibility for the delays in this case, he should still be allowed relief under the constitution because the delays were his attorneys' fault, not his. Mr. Griggs cites no authority for his position, and it is directly contrary to the following statement from *Castellanos v. State,* 2016 WY 11, ¶ 73, ___ P.3d ____ (Wyo. 2016): "[A]n attorney 'is the defendant's agent when acting, or failing to act, in furtherance of the litigation, delay caused by the defendant's counsel is also charged against the defendant.' *Vermont v. Brillon,* 556 U.S. 81, 91, 129 S. Ct. 1283, 1291, 173 L. Ed. 2d 231 (2009) (quoting *Coleman v. Thompson,* 501 U.S. 722, 753, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991)) (footnote omitted)." Further, the facts do not support Mr. Griggs' argument. The 168 day delay in holding the preliminary hearing was due to his personal decisions to change attorneys. With regard to the defense motions for continuances of the trial, Mr. Griggs' attorney was attempting to secure assistance of an expert. Mr. Griggs waived his speedy trial right to accommodate those efforts. There is simply no basis for his argument that he should not be held responsible for the delays requested by his defense counsel.

[¶67] In weighing the delays attributable to the State versus the delays attributable to the defendant, we must conclude this factor weighs in favor of the State. The bulk of the delay was caused by Mr. Griggs' requests for continuances.

### C. Defendant's Assertion of Right

[¶68] The third factor in a constitutional speedy trial analysis is the defendant's assertion of his right to a speedy trial. Although a defendant is not required to assert his right to a speedy trial, the vigor with which the defendant asserted his right is an important consideration in determining the reasonableness of any delay. *Berry,* ¶ 45, 93 P.3d at 236, citing *Harvey,* 774 P.2d at 95. *See also Durkee,* ¶ 34, 357 P.3d at 1115.

21

[¶69]  Mr. Griggs did not file a written demand for a speedy trial until May 2, 2013, over ten months after the State filed charges.  A little over a month later, he waived his right to a speedy trial in conjunction with his request for a continuance of the June 2013 trial setting.  On appeal, Mr. Griggs claims that he only waived his right to a speedy trial because he was promised that an expert witness would be secured and he did not receive the "promised benefit."  He suggests his attorney was incompetent for not vigorously asserting his right to a speedy trial.  We note that this argument was not included as part of Mr. Griggs' ineffective assistance of counsel claim and he provides no authority for his argument that his waiver of the right to a speedy trial should be ignored under these circumstances.  Furthermore, earlier in the case, he waived his right to a speedy preliminary hearing on more than one occasion, ultimately delaying the trial.  On this record, it is clear that he did not vigorously assert his right to a speedy trial.  This factor weighs in favor of the State.

### D.  Prejudice to Defendant

[¶70]  The fourth *Barker* factor addresses the prejudice resulting from the delay in bringing a criminal defendant to trial.  We have identified three types of prejudice a defendant may suffer as a result of pretrial delay, including "1) lengthy pretrial incarceration; 2) pretrial anxiety; and, 3) impairment of the defense."  *Berry,* ¶ 46, 93 P.3d at 236-37, quoting *Harvey,* 774 P.2d at 96.  The impairment of defense factor is the most serious because it affects the defendant's ability to prepare his case, skewing the fairness of the system.  *Durkee,* ¶ 37, 357 P.3d at 1116; *Ortiz,* ¶ 62, 326 P.3d at 896.

[¶71]  Mr. Griggs was incarcerated the entire time he awaited trial apparently because he could not afford to post bond.  He claims that, as a result of his incarceration, he was unable to assist his elderly parents or attend the funeral of his stepfather.  While we have no doubt that he suffered pretrial anxiety, Mr. Griggs makes no showing that his troubles were more serious than the typical defendant awaiting trial.  In order to demonstrate prejudice arising from pretrial incarceration and anxiety, "a defendant must demonstrate he 'suffered prejudice in an extraordinary or unusual manner.'"  *Miller,* ¶ 44, 217 P.3d at 805, quoting *Strandlien,* ¶ 16, 156 P.3d at 992.

[¶72]  Mr. Griggs also argues that his defense was impacted because of the pretrial delay. He asserts that during this time the children were in therapy and subjected to repeated questioning about the events, possibly tainting them.  Mr. Griggs points to the fact that the language the children used to describe the abuse changed over time, from colloquial descriptions of anatomical parts like "mahookie" or "pahookie" to more common descriptions like "private parts."  The problem with Mr. Griggs' argument is that, while the language they used to describe the abuse matured, the substance of the children's

statements did not change. Thus, there was no showing that their memories or testimony were affected by the delay.

[¶73] He also claims that "the children were subjected to some level of tampering or influence" by their biological mother while he was awaiting trial. During the trial, the biological mother, RM, testified that her unsupervised visitation with the children had been changed because DFS believed she was "telling [the] children what to say." It was not clear at trial what she was discussing with the children. However, at the remand hearing, the defense expert testified that JM said in therapy that RM told the children not to tell "bad stuff" or they would not be able to go home. This evidence suggests RM coached the children to deny the allegations, which would have been to Mr. Griggs' advantage. Thus, he has not shown his defense was prejudiced by the delay in bringing him to trial. This factor, therefore, weighs in favor of the State.

### E. Balancing the Factors

[¶74] Of the four *Barker* factors, only the length of delay weighs in favor of Mr. Griggs. The other factors all weigh against him and in favor of the State. On this record, Mr. Griggs' constitutional right to a speedy trial was not violated.

## IV. Continuance

[¶75] Mr. Griggs claims the district court abused its discretion by denying his last motion for a continuance. We apply the following standard of review to his claim:

> We have consistently held that the grant or denial of a motion for continuance is a discretionary ruling of the district court and, unless a clear showing of an abuse of discretion resulting in manifest injustice has been shown by the challenging party, we will not disturb that ruling. *Sincock v. State,* 2003 WY 115, ¶ 25, 76 P.3d 323, 333–34 (Wyo.2003); *Clearwater v. State,* 2 P.3d 548, 553 (Wyo.2000). The determination of whether the district court abused its discretion in refusing to grant a continuance is highly dependent upon the facts and circumstances of the individual case. *Sincock,* ¶ 25, 76 P.3d at 333. On review, our primary consideration is the reasonableness of the district court's decision. *Id.*

*Grady v. State,* 2008 WY 144, ¶ 18, 197 P.3d 722, 729 (Wyo. 2008). *See also Secrest v. State,* 2013 WY 102, ¶ 13, 310 P.3d 882, 885 (Wyo. 2013).

23

[¶76] On August 2, 2013, Mr. Griggs filed a motion to continue the trial which was set to commence on August 13, 2013. He claimed that his expert, Dr. Gregory, needed more time to "review the materials, render an opinion, and appraise [sic] the [d]efense as to the course of action as to what is discovered." The district court denied the motion.

[¶77] Mr. Griggs claims his situation is comparable to the one we addressed in *Adger v. State,* 584 P.2d 1056 (Wyo. 1978). After problems developed between Ms. Adger and her private counsel, two public defenders were appointed to represent her just four days prior to trial. *Id.* at 1058. The district court denied a motion for a continuance to allow the new attorneys more time to prepare, blaming the defendant for the situation. This Court disagreed, finding that private counsel caused the problem by not being honest with the defendant and the district court about the extent of his representation. *Id*. at 1060-61. We concluded the district court abused its discretion when it denied Ms. Adger's request for a continuance to give her newly appointed public defenders adequate time to prepare for trial. *Id.* at 1061-62.

[¶78] Mr. Griggs claims he was in a similar situation because his expert witness did not have sufficient time to review the materials and adequately advise defense counsel. As we pointed out in our discussion on the effectiveness of counsel, *supra,* the defense was sufficiently prepared for trial. Dr. Gregory was able to assist defense counsel in preparation, and counsel capably used that assistance in cross examination and argument. This stands in stark contrast to *Adger* where the defense attorneys only had a few days to prepare and were unable to present an adequate defense for the defendant. In addition, as our discussion on the speedy trial issue evinces, Mr. Griggs had been given numerous continuances. Under the facts and circumstances of this case, he has failed to show that the district court abused its discretion by denying the motion to continue or that the lack of a continuance in any way prejudiced his defense, much less resulted in manifest injustice. *See Grady* and *Secrest, supra.*

## V. **Hearsay**

[¶79] Mr. Griggs claims the district court erred by allowing the foster mother, the biological mother, a forensic interviewer and a nurse-practitioner to testify about the children's reports of sexual abuse. He claims the testimony was inadmissible hearsay.

[¶80] Under W.R.E. 802, hearsay statements generally are not admissible. W.R.E. 801 defines hearsay as:

> (c) *Hearsay*. – "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing,

24

offered in evidence to prove the truth of the matter asserted.

[¶81] Mr. Griggs objected to some of the statements he challenges as hearsay on appeal, but not to others. Our standard of review depends upon whether or not a proper trial objection was made.

> Evidentiary rulings are . . . committed to the sound discretion of the district court and are not subject to appellate second guessing absent an abuse of discretion. *Lopez v. State,* 2004 WY 103, ¶ 21, 98 P.3d 143, 149 (Wyo.2004). When no objection is made at trial to the evidence challenged on appeal, we apply our plain error standard of review. Plain error will not be found unless: (1) the record clearly reflects the alleged error; (2) the party claiming the error demonstrates a violation of a clear and unequivocal rule of law; and (3) the party proves that the violation adversely affected a substantial right resulting in material prejudice. *Miller v. State,* 2006 WY 17, ¶ 15, 127 P.3d 793, 797–798 (Wyo.2006).

*Cazier v. State,* 2006 WY 153, ¶ 10, 148 P.3d 23, 28 (Wyo. 2006). *See also Proffit v. State,* 2008 WY 102, ¶ 19, 191 P.3d 963, 970 (Wyo. 2008).

### A. Foster Mother

[¶82] The children's foster mother, TP, testified about the children's reports of sexual abuse. She was the first witness to testify at trial and gave detailed accounts of CM's and SM's statements that Mr. Griggs had sexual intercourse with, and performed cunnilingus, upon them. TP also testified that JM told her that he watched Mr. Griggs abuse the two girls. The defense did not object to her testimony, so we review Mr. Griggs' claim that her testimony was inadmissible hearsay for plain error.

[¶83] The first element of the plain error standard is satisfied in this case because TP's testimony, including her recitation of the children's statements, is clearly shown in the record. The second element requires a showing of a violation of a clear and unequivocal rule of law. As we stated, above, hearsay generally is not admissible. Rule 802. Citing *Craft v. State,* 2012 WY 166, 291 P.3d 306 (Wyo. 2012), the State claims TP's testimony relating the children's reports was admissible because it was not admitted for the truth of the matter asserted (i.e., that the abuse had actually occurred) but rather to show what TP did in response to the reports. We stated in *Craft:*

> [A] prosecutor may properly use out-of-court statements to show their effect on the hearer, to explain why the hearer did what he did or why a conversation took a particular turn. The hearsay rule does not prohibit using the statements in that manner because it does not relate to proving the truth of those statements. 4 Mueller & Kirkpatrick, *supra,* § 8:20; *see also Proffit,* ¶ 21, 191 P.3d at 970.

*Id.,* ¶ 24, 291 P.3d at 312.

[¶84] *Craft* did not involve a situation like the one presented in this case. There, we addressed whether the prosecutor committed misconduct by referring to a sexually explicit text message exchange between the defendant and the victim. The evidence was proper because its purpose was not to establish the truth of any of the statements in the text message exchange, but to show that the parties had exchanged messages of a sexual nature. *Id.,* ¶¶ 24-25, 291 P.3d at 312-13. *See also Kenyon v. State,* 986 P.2d 849 (Wyo. 1999) (ruling the district court erred by refusing to allow the defendant to testify that his fiancé told him they had the owner's permission to use a truck because the statement was not offered to prove the truth of the matter asserted, i.e., that they actually had permission, but to show its effect on defendant's intent and subsequent conduct).

[¶85] Testimony repeating a report of the defendant's criminal behavior may fall within the rule allowing out of court statements to show their effect on the hearer rather than for the truth of the matter asserted. The issue often arises during the testimony of an investigating law enforcement officer. For example,

> [a]n out-of-court declaration by a third party to a police officer which is offered at trial merely to explain the officer's conduct in the investigation of a crime is usually admissible because it is not offered for the truth of the matter stated. The conduct to be explained should be relevant, in need of explanation, and contemporaneous with the statements.

29 Am. Jur. 2d *Evidence* § 676 (2015). *See also Schreibvogel v. State,* 2010 WY 45, ¶ 28, 228 P.3d 874, 884 (Wyo. 2010); *Kerns v. State,* 920 P.2d 632, 640-41 (Wyo. 1996); *Olson v. State,* 698 P.2d 107, 113-14 (Wyo. 1985) (an officer's testimony reciting a victim's or witness's statement elicited to provide context for the investigation may be admissible if it is not offered to prove the truth of the matter asserted).

[¶86] The Tenth Circuit has written extensively on this issue. It summed up the general rule in *United States v. Freeman,* 816 F.2d 558, 563 (10th Cir. 1987): "[O]ut of court statements are not hearsay when offered for the limited purpose of explaining why a

Government investigation was undertaken." The rationale for allowing such testimony was explained in *United States v. Cass,* 127 F.3d 1218, 1223 (10th Cir. 1997), quoting 2 *McCormick on Evidence* (4th ed.) § 249, at 104 (other citations omitted and emphasis added):

> [A]n arresting or investigating officer should not be put in the false position of seeming just to have happened upon the scene; he should be allowed some explanation of his presence and conduct. [**However,**] testimony that [the officer] acted **"upon information received," or words to that effect, should be sufficient.**

*See also* 2 *McCormick on Evidence* § 249 (7th ed. 2013). In other words, the use of out of court statements to show the effect on the hearer is limited. It may be necessary and appropriate to introduce some out of court statements or portions of statements to explain the course of events, but other portions of the same statements may go far beyond what is necessary for this limited purpose. The rationale may not be used to inform the jury of the details of a victim's allegation of the criminal conduct or a witness's statement when those details are not necessary to explain what happened next. *Id.; Kern,* 920 P.2d at 640-41; *Longstreth v. State*, 832 P.2d 560, 563 (Wyo. 1992).

[¶87] In *United States v. Becker,* 230 F.3d 1224, 1228 (10th Cir. 2000), the Tenth Circuit evaluated whether it was proper for the trial court to admit a police officer's recitation of the out-of-court statement of a non-testifying informant that the defendant was selling drugs.[6] The court concluded the officer's testimony was not admissible to show its effect on the hearer because it pertained directly to the defendant's guilt and the government relied upon the informant's statement for its truth. The court stated "that such evidence was used for more than the 'limited' purpose" of showing its effect on the officer. *Id.* at 1229-30.

[¶88] In *United States v. Hinson,* 585 F.3d 1328, 1336-38 (10th Cir. 2009), the Tenth Circuit ruled an officer's statement that she heard the defendant's name mentioned during the investigation as someone who was supplying drugs to another suspect was not necessary background information and its only purpose was to bolster the government's claim that the defendant was, in fact, a drug supplier. *See also Cass,* 127 F.3d at 1222;

---

[6] *Becker* also evaluated whether admission of the statement violated the Confrontation Clause of the Sixth Amendment to the United States Constitution. A Confrontation Clause issue arises when a testimonial statement by an absent declarant is allowed into evidence at trial. Thus, it does not apply when the declarant testifies at trial. *Crawford v. Washington,* 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). As *Becker* demonstrates, Confrontation Clause issues are often intertwined with hearsay questions. Mr. Griggs does not present an argument under the Confrontation Clause in this case.

*Ortiz,* ¶ 100, 326 P.3d at 902 (testimony by victim's relative that her daughter told her the victim's siblings acted in an inappropriate and sexualized manner was inadmissible hearsay because it was offered to prove the truth of the matter asserted).

[¶89]  Thus, the dispositive question in cases involving this type of evidence is whether it was truly offered as background information or to prove the truth of the matter asserted. *United States v. Espinosa,* 585 F.3d 418 (8th Cir. 2009), provides a good example of a proper limited use of a sexual abuse victim's report to authorities.[7]  Espinoza challenged the district court's rulings allowing several witnesses to testify about the victim's report of the abuse to them.  In each case, the witness said that the victim had reported the abuse to them, but did not describe her accusations in detail.  The Eighth Circuit held that the statements were proper because they were not presented for the truth of the matter asserted, i.e., that the victim had actually been abused, but "merely to show that the witnesses had conversations with [the victim] and the witnesses' subsequent actions." *Id.* at 433.  *See also State v. Hernandez,* 823 P.2d 1309, 1314 (Ariz. 1991).

[¶90]  Even if a statement fits within the "effect on the hearer" rationale, the court must ensure it is otherwise admissible.  Evidence which may be admissible to explain "the background of an investigation ... must be evaluated under ... Fed. R. Evid. [ ] 401 and 403 for relevance and to prevent confusion or prejudice." *Freeman,* 816 F.2d at 563. *See also* 30B Fed. Prac. & Proc. Evid. § 7005 (2014) (stating testimony "relevant for its effect on the listener is subject to exclusion under Rule 403").  W.R.E. 403 states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Thus, the court must exclude evidence that contains "accusations so damaging to the accused that the risk the jury will consider the words for their truth outweighs their probative value as an explanation of official conduct." 29 Am. Jur. 2d *Evidence* § 676.

[¶91] A limiting instruction is an effective way to ensure the jury only considers the evidence for the appropriate reason and not for the truth of the matter asserted.  30B Fed.

---

[7] Some states have added an exception to the hearsay rule for a child's out of court report of abuse if the child is available at trial for cross examination.  *See, e.g., State v. Rodriguez-Castillo,* 188 P.3d 268, 271 (Or. 2008), citing OEC 803(18a)(b).  For example, Texas allows admission of "outcry statements" as an exception to the hearsay rule.  An outcry statement is "the first report of sexual abuse that a victimized child makes to a person over the age of eighteen." *Morrison v. State,* 2007 WL 614143, *2 (Tex. Ct. App. 2007), citing Tex. Code Crim. Proc. Ann. art. 38.072, § 2(a).

Prac. & Proc. Evid. § 7005. *See also Becker,* 230 F.3d at 1230-31 (noting the district court's use of a limiting instruction helped neutralize the error in admission of the testimony). In *Schreibvogel,* ¶ 28, 228 P.3d at 884, we noted that, if out of court statements are offered to provide context for an investigation rather than to prove the truth of the matter asserted, "a limiting instruction would be appropriate if requested by the defendant." *See also Olson,* 698 P.2d at 114.

[¶92] The record in this case clearly establishes the State presented TP's testimony about the children's statements to prove the truth of the matter asserted, i.e., that the abuse occurred. TP's testimony about the children's reports of abuse was very detailed, including the children's statements about the specific sexual acts and identification of "Byron" as the perpetrator. None of those details were necessary to explain what TP or others did next. The State inquired about them to prove the truth of the allegations. TP's testimony went far beyond the examples given by the various authorities of appropriate recitation of an out of court statement to show its effect on the hearer. Furthermore, the prosecutor repeated TP's testimony in detail during closing argument and stated:

> That is how it started. That's why it was investigated of what the children told [TP]. The children have been talking for two years now. It's more than two years now that they have been saying this, and they've been saying it over and over.

The prosecutor continued using TP's testimony for the truth of the matter asserted in rebuttal closing argument. She stated several times that the children's statements were consistent over a two year period, starting with their reports to TP, which the prosecutor again recounted. The jury was not instructed that the testimony was not admitted for the truth of the matter asserted because defense counsel did not object or request a limiting instruction.

[¶93] The children's detailed statements to TP were not admissible as non-hearsay to show their effect upon the hearer. The district court violated a clear and unequivocal rule of law when it allowed TP to testify about the children's reports of the sexual abuse and allowed the prosecution to use the testimony to establish the truth of the children's statements. We will evaluate the prejudice associated with the error below, after we analyze Mr. Griggs' other hearsay issues.

B. <u>Biological Mother</u>

[¶94] Next, Mr. Griggs' claims the district court erred by allowing RM to testify that SM reported the abuse to her, but she did nothing about it. The defense objected to RM's

testimony, and the State responded that it was not offering the testimony for the truth of the matter asserted but to show the effect it had on RM and her subsequent reactions to it. The State asserted it was important to show why the abuse was not reported earlier. The district court allowed the testimony for that purpose and specifically instructed the jury that it was going to allow RM's testimony "not because it goes to the truth of what's being said, but it goes to this witness's reaction to what she was told."

[¶95] The district court did not abuse its discretion by allowing RM to testify about SM's statements. It appropriately allowed the testimony to show its effect on the hearer in accordance with *Craft* and the other authorities cited above. Unlike with TP, RM's testimony was properly limited to a general statement about SM's report, without recounting any details, and the district court gave an appropriate limiting instruction.

## C. Forensic Interviewer

[¶96] Mr. Griggs asserts that the forensic interviewer should not have been allowed to recount CM's and JM's statements about the abuse.[8] Defense counsel repeatedly objected to the testimony, claiming it was hearsay, cumulative and amounted to vouching for the victims. The State asserts the statements were admissible as prior consistent statements because the children testified at trial and were subject to cross examination, and the defense alleged the children had fabricated the reports or were improperly influenced. The district court allowed the forensic interviewer to testify about the children's prior consistent statements.

[¶97] Under W.R.E. 801(d)(1)(B), some prior consistent statements are not hearsay:

> (d) *Statements which are not hearsay*. – A statement is not hearsay if:
>
> (1) *Prior Statement by Witness*. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with his testimony, and, if offered in a criminal proceeding, was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition, or (B) consistent with his testimony and is offered to rebut an express or implied charge against him of recent

---

[8] The forensic interviewer did not interview SM. The State acknowledged at trial that SM's prior consistent statements would not be admissible because she did not give any substantive testimony at trial. Consequently, it did not call SM's forensic interviewer to testify at trial.

fabrication or improper influence or motive, or (C) one of identification of a person made after perceiving him[.]

[¶98] There are four requirements for admission of a prior consistent statement under W.R.E. 801(d)(1)(B):

> (1) that the declarant testify at trial; (2) that the declarant be subject to cross-examination concerning the prior statement; (3) that the prior statement be consistent with the declarant's trial testimony; and (4) that the prior statement be offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive.

*Lancaster v. State,* 2002 WY 45, ¶ 17, 43 P.3d 80, 88 (Wyo. 2002).

[¶99] The first element of the test is clearly satisfied as JM and CM testified at trial. With regard to the second element, both children were subject to cross examination at trial about the incident and their reports. During cross examination, defense counsel asked JM about "people you talked to about that experience." JM said he had talked to a counselor but could not remember which one. Defense counsel also briefly questioned CM about reporting the incident. While the cross examination of the children was not extensive and did not yield much about their prior statements, the second element of the test is satisfied. *See Tombroek v. State,* 2009 WY 126, ¶ 9, 217 P.3d 806, 810 (Wyo. 2009); *Martin v. State,* 2007 WY 76, ¶ 27, 157 P.3d 923, 927 (Wyo. 2007) (second element of the test was satisfied because the declarant was subject to cross examination about the incident).

[¶100] Under the third element of Rule 801(d)(1)(B), the statements must be "consistent" with the declarant's trial testimony. *Lancaster,* ¶ 17, 43 P.3d at 88-89; *Curl v. State,* 898 P.2d 369, 374 (Wyo. 1995). A prior consistent statement cannot be used as a means of proving "new points not covered in the testimony" of the declarant. *Curl,* 898 P.2d at 374 (citation omitted). "[M]aterial information presented for the first time to support a prior 'consistent statement' has no antecedent with which to be consistent or inconsistent and is, therefore, inadmissible." *Id. See also Lancaster,* ¶ 17, 43 P.3d at 89. However, the prior consistent statement does not have to be identical to the declarant's trial testimony to be admissible under Rule 801(d)(1)(B). *Lancaster,* ¶ 17, 43 P.3d at 88; *Curl,* 898 P.2d at 374. Instead, the rule allows admission of a statement that is generally consistent with the trial testimony. *Id.*

[¶101] JM testified that he saw Mr. Griggs touch his "sissies" private spots with his private spot. JM refused to demonstrate where the "private spot" was on his own body or

on a drawing of a person, although he did agree to tell the prosecutor when her hand was in front of that part of the body on herself. During that exercise, the prosecutor started with her hand at her feet and moved up her body. JM stopped her when her hand was in front of the pelvic area.

[¶102] The forensic interviewer testified as follows regarding JM's statements to her:

> Q. What did [JM] tell you Bryon had done to his sisters?
> A. He disclosed that Byron had put his privates on his sisters', both of his sister's . . . crotches.

She also testified that JM demonstrated Mr. Griggs moving his privates in and out of his sisters by forming a circle with the fingers of one hand and moving the index finger of his other hand in and out of the circle. Although the forensic interviewer's recitation of JM's statement to her was not identical with his trial testimony, it was clearly consistent.

[¶103] CM stated at trial that Mr. Griggs stuck "his pee-pee in my butt," and "licked my bad area" with his tongue. CM also testified that Mr. Griggs' abused her sister (SM) in the same way. At trial, the forensic interviewer testified that CM told her Mr. Griggs put his "pee-pee in her butt" and "licked her crotch." She said that CM told her that he had done the same things to her sister. The interviewer also stated that CM demonstrated how Mr. Griggs had thrust his pelvis and licked during the abusive episodes. Like with JM, the forensic interviewer's testimony about the statements made by CM was consistent with CM's trial testimony even though it was not identical.

[¶104] The fourth element of the test is the prior statement must be offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive. With regard to the temporal requirement of a "recent" fabrication or improper influence in the fourth factor, we have said:

> A prior consistent statement may be used as substantive evidence if the alleged improper influence arose after the statement was made. *Montoya,* 822 P.2d at 367 (citing *Stephens v. State,* 774 P.2d 60, 71 (Wyo.1989)). However, if the prior consistent statement was made after the improper influence arose, then the statement may only be used for rehabilitative purposes. *Id.* When a prior consistent statement is admissible only for rehabilitative purposes, a limiting instruction must be given, but only if requested. *Id.*

*Frenzel v. State,* 849 P.2d 741, 751 (Wyo. 1993).

[¶105] Our approach is intentionally different from the federal courts' application of F.R.E. 801(d)(1)(B) which limits admission of consistent statements to those that were made prior to the alleged fabrication or improper influence or motive. Consequently, Wyoming courts allow a broader use of prior consistent statements than the federal courts do. *See Seward v. State,* 2003 WY 116, ¶¶ 14-17, 76 P.3d 805, 811-12 (Wyo. 2003); *Dike v. State,* 990 P.2d 1012, 1024 (Wyo. 1999). Compare, *Tome v. United States,* 513 U.S. 150, 115 S. Ct. 696, 130 L. Ed. 2d 574 (1995) (reiterating common law rule that only consistent statements made *before* the alleged improper influence or motive to fabricate arose are admissible under FRE 801(d)(1)(B)).

[¶106] Mr. Grigg's general defense was that the children fabricated their stories as a result of improper influence by their biological mother (RM) and/or being exposed to inappropriate information such as pornography. He claimed the fabricated stories were perpetuated by various adults who employed improper interview techniques during the investigation. At trial, the prosecutor asserted the forensic interviewer's testimony was admissible under the prior consistent statement rule because "[t]here's definitely been assertions that the children were told what to say by [RM]. That was asked, I believe, both of [JM] and [CM] yesterday, and there [were] even indications that there – there were suggestions that there had been improper motives behind whether they had been told to say certain things."[9] The district court noted that the defense had attacked the children's credibility in its opening statement. The district court stated that, under those circumstances, the forensic interviewer could testify about CM's and JM's consistent statements.

[¶107] The timing of the alleged improper influence in this case is difficult to discern. The prosecutor asserted that the defense had suggested RM told the children what to say both before and after the forensic interviews. The difficulty in specifically identifying the nature and time of the improper influence is part of the reason we have declined to follow federal precedent on the temporal requirement of Rule 801(d)(1)(B). *See Lancaster,* ¶ 16, 43 P.3d at 88, citing *Makinen v. State,* 737 P.2d 345, 349 (Wyo. 1987) (stating "[i]n departing from federal precedent, this Court emphasized the inherent difficulty in determining when an improper motive may have arisen, and chose to leave such matters to the trier of fact"). Given Mr. Griggs' general defense was the children were unreliable witnesses, had fabricated the accusations and were improperly influenced by RM and other adults who participated in the investigation, the fourth element of Wyoming's Rule 801(d)(1)(B) test was satisfied. Mr. Griggs did not request an instruction limiting the

---

[9] On appeal, Mr. Griggs claims the prosecutor indicated that she was not presenting the forensic interviewer's testimony as a prior consistent statement. This assertion is a misstatement of the colloquy. The prosecutor was clearly relying on Rule 801(d)(1)(B).

purpose of the evidence to rehabilitation of the victims; thus, the district court did not err by failing to give one. *Frenzel,* 849 P.2d at 751.

[¶108] Mr. Griggs' argument that the district court abused its discretion by allowing the forensic interviewer to testify about the children's statements also touches on another aspect of our law on prior consistent statements. He claims his case is like *Wilde v. State,* 2003 WY 93, 74 P.3d 699 (Wyo. 2003), where we ruled that the district court had misapplied the prior consistent statement rule. In that case, the victim testified first at trial. Thereafter, the victim's mother, a law enforcement officer, the victim's pediatrician, an emergency room nurse, and a forensic examiner were called as witnesses and they repeated all, or parts of, the victim's allegations. We concluded the district court's admission of the testimony was an abuse of discretion, reasoning:

> Wilde contends that AM fabricated at least part of her story, and that she told the same fabricated story to her mother, sister, police officer, physician, nurse, and "forensic interviewer." Each of those witnesses then repeated AM's "consistent" story without much variation. Thus, the circumstances presented here are more in the nature of several, more-or-less contemporaneous repetitions of a single statement, rather than *prior* consistent statements . . . .

*Id.,* ¶ 12, 74 P.3d at 707.

[¶109] Although the *Wilde* opinion discussed the timing of the statements, our primary concern was that the State's purpose in presenting numerous witnesses to repeat the victim's statement was to bolster the victim's testimony by "piling on" consistent statements. *Id.*, ¶ 14, 74 P.3d at 707-08, quoting 4 Christopher B. Mueller and Laird C. Kirkpatrick, Federal Evidence, § 405 (2nd ed. 1994 and Supp. 2002). This Court addressed a similar issue in *Seward* where the district court permitted a forensic interviewer to testify about the victim's statements. We noted that prior consistent statements may be admissible to provide the jury with the entire picture so it can determine if there is any real inconsistency in the victim's accounts. However,

> [p]rior consistent statements are governed by the general principles of relevancy found in W.R.E. 401, 402, and 403, and are not admissible without limitation. Further, repetitious testimony of prior consistent statements offered for rehabilitative purposes is not always admissible:

If the corrupting influence did in fact precede the statements, probative value is greatly diminished.

" * * * Evidence which merely shows that the witness said the same thing on other occasions when his motive was the same does not have much probative force 'for the reason that repetition does not imply veracity.' "

*Stephens v. State,* 774 P.2d 60, 72 (Wyo.1989) (*quoting* 4 J. Weinstein & M. Berger, Weinstein's Evidence, ¶ 801(d)(1)(B)[01] at 803-150 to -151 (1987)).

*Seward,* ¶¶ 14-17, 76 P.3d at 811-12 (footnote omitted).

[¶110] We explained the procedure which should be followed by the district court in such cases:

[W]here there is a proper objection, the trial court should consider whether having numerous authority figures trained to recognize sexual abuse appear at trial is actually a trial strategy of preparing a multitude of self-serving, biased, inflammatory, video, audio, and written statements for trial; having the witness testify; and then introducing into evidence these consistent statements made prior to testifying. *See Baum v. State,* 745 P.2d 877, 882 (Wyo.1987) (Cardine, J. and Urbigkit, J., specially concurring). Such a trial strategy could render the statements irrelevant and unfairly prejudicial, particularly if the consequence of repeating the same testimony several times unduly emphasizes that testimony over all other testimony in the case.

*Seward,* ¶ 16, 76 P.3d 811-12.

[¶111] We provided additional explanation of the issues which may arise with prior consistent statements and distinguished *Seward* and *Wilde* in *Tombroek,* ¶¶ 14-15, 217 P.3d at 811-12:

Our concern in *Seward* was not so much the repetitious nature of the testimony, as it was the State using W.R.E. 801(d)(1)(B) as a tool for impermissible trial tactics by having a victim repeat accusations to authority figures for the

35

direct purpose of using those statements later at trial as prior consistent statements. *Id.* . . . We did . . . acknowledge that W.R.E. 801(d)(1)(B) is susceptible to abuse and we take this opportunity to repeat that concern. *Id.* at ¶ 16 n. 6, at 812 n. 6. In fact, we even cautioned district courts regarding admitting this type of testimony without first considering why the interviews occurred and the probative value of admitting such evidence. *Id.* at ¶ 17, at 812. However, the concerns that we discussed in *Seward* do not exist here. The victim made her statements to the witnesses in a manner that would be expected from a victim in the early stages of a typical sexual assault investigation, rather than in a manner resembling trial preparation tactics, as was our concern in *Seward.* Accordingly, the prior consistent statements were properly admitted.

The appellant also relies upon *Wilde v. State,* 2003 WY 93, ¶¶ 11–14, 74 P.3d 699, 706–08 (Wyo.2003), wherein we reversed a conviction under somewhat similar circumstances. A reading of that entire opinion reveals, however, that the focus of our concern was, as in *Seward,* the vouching nature of the questioned testimony, and its resultant prejudice. Furthermore, the nature of discretionary review emphasizes "the question of the reasonableness of the trial court's choice." *Id.* at ¶ 13, at 707.

[¶112] Unlike in *Wilde* and *Seward,* Mr. Griggs has not demonstrated that the State procured the forensic interviews for the purpose of presenting them at trial to bolster the children's statements. Instead, as in *Tombroek,* the children made their statements to the forensic interviewer shortly after the initial report in a manner that would be expected in the early stages of a typical investigation. In fact, the interviewer in this case was part of the DFS team that initially went to the biological mother's home after receiving a call from the school about the children's lice infestation and concerns about a dirty home. She testified about the conditions in the house and the children's chronic lice infestation and stated that DFS took the children into protective custody because of the problems. The forensic interviewer also testified about medical concerns with the children, which led to appointments with health care providers. Clearly, the forensic interviewer's participation in the case was not for the direct purpose of bolstering the children's testimony. Furthermore, the State did not show the jury videotape of the interviews, which lessened the prejudicial impact of the evidence. *Compare Seward, supra.*

36

[¶113]   The district court did not abuse its discretion when it allowed the forensic interviewer to testify concerning JM's or CM's consistent statements.  The testimony was properly admitted under Rule 801(d)(1)(B).

D.  Nurse Practitioner

[¶114]   Finally, Mr. Griggs challenges the testimony of a nurse practitioner who examined the children in August 2012, over a year after the abuse.  The nurse practitioner testified, over objection, as to what the children told her about the abuse and what TP told her about the children's reports of abuse.  The district court admitted the testimony about the children's statements under W.R.E. 803(4), the exception to the hearsay rule for statements made for purposes of medical diagnosis or treatment.   Rule 803 states:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> . . . .
>
> (4) *Statements for Purposes of Medical Diagnosis or Treatment.* – Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

[¶115]  In *Stephens v. State,* 774 P.2d 60, 72 (Wyo. 1989), overruled on other grounds in *Large v. State,* 2008 WY 22, 177 P.3d 807 (Wyo. 2002), we recognized there are two aspects to establishing proper foundation for admission of evidence under the medical exception to the hearsay rule in Rule 803(4):

> * * * [F]irst, the declarant's motive in making the statement must be consistent with the purposes of promoting treatment [or diagnosis]; and second, the content of the statement must be such as is reasonably relied on by a physician in treatment or diagnosis.

*Id.*, quoting *United States v. Renville,* 779 F.2d 430, 436 (8th Cir. 1985).  *See also Blake v. State,* 933 P.2d 474, 477-78 (Wyo. 1997); *Betzle v. State,* 847 P.2d 1010, 1017-18 (Wyo. 1993).

[¶116] We revisited the issue in *McLaury v. State,* 2013 WY 89, 305 P.3d 1144 (Wyo. 2014) in the context of a Sexual Assault Nurse Examiner's (SANE nurse) testimony.

Acknowledging that a SANE nurse has dual roles of providing medical care and collecting and preserving evidence for criminal prosecution, we stated that we would continue to use our two part test, "while still focusing on the trustworthiness of the statements, which can be established by considering one rationale or to some degree both rationales. *Id.,* ¶ 15, 305 P.3d at 1149.

[¶117]  The nurse practitioner testified with regard to her examination of CM as follows:

> A. . . . I went into the examination room and spoke to [CM].
> Q. Okay. And again, why is it that you're . . . trying to get information from [CM]?
> A. Well, . . . it's important that I try and figure out what happened, and so really, . . . it's very important for me to get that information from the child before I do my assessment. Sometimes they tell me things they haven't told anyone else, and so if there was disclosure of certain things that had gone on, then that's going to maybe change the way I do my assessment . . . so I always speak to the child.
> Q. And ultimately, are you doing it for purposes of medical diagnosis and treatment?
> A. Absolutely.
> Q. Okay. When you talked to [CM], what did she tell you?
> . . . .
> A.  I spoke to [CM] and told her what we do at the Children's Justice Center, which is to – that my job is to try and make sure that children are healthy and safe, and I said, we see children who sometimes grown ups or big people have done things that make children feel sad or uncomfortable or hurt them in some way, and I asked her if anything had happened like that to her.
> Q. What is it that she told you?
> A. She nodded her head and . . . I asked her if she could tell me about that, and she said, Byron did it.  I asked [CM] what Byron did.  She said, I don't want to tell because it's . . . kind of nasty.  I reassured her that she could tell me anything that she needed to.
> . . . .
> Q. Okay.  You had said that [CM] had talked about it being nasty, you reassured her.  Did she tell you something after you reassured her?
> A. Yes.

Q. And what is it that she told you?

A. . . . She talked about Mr. Griggs putting his mouth on her genital area and sticking it in her pahookie.

Q. Okay. And did you talk to her about her pahookie?

A. I did. I asked her if she – if she – if she meant that the pahookie was in the front or the back, and she said the front.

Q. . . . Was there . . . something that she pointed at?

A. She pointed to her genitals.

. . . .

Q. Okay. Did you ask any further questions about that happening?

A. Yes. I asked if she ever had any bleeding. She said no. I asked her if she had seen Byron do that to anyone else, and she said, yes, my sister. I asked her if she had ever seen anything come out of Byron's private part, and she said no.

Q. Okay. Did you talk to her about any pain?

A. I asked her if it hurt her, and she said yes.

Following their discussion, the nurse practitioner examined CM but did not find anything unusual. She stated that her "final assessment was that the history for sexual abuse was positive, the examination was normal, negative, and I think she also had an ear infection on the right."

[¶118] The nurse practitioner also testified about SM's statements to her. She explained her role to SM as she did with CM and asked SM to tell her if anyone had hurt or touched her in a way that made her uncomfortable. She testified that SM told her that a "guy" named "Byrum" had hurt her front and back "mahookie" and she told him to stop. SM explained that he had touched her mahookie with his private part. She said it hurt a little but denied any bleeding or seeing anything come out of his private part. The nurse then conducted a general physical assessment and an anal-genital exam on SM. She stated that SM had a "stuffy nose" and noted various findings from the anal-genital examination but concluded the examination did not show any abnormalities.

[¶119] The nurse practitioner's testimony about the children's statements clearly fell within the medical diagnosis exception to the hearsay rule in Rule 803(4). The nurse asked the girls questions about the alleged abusive incidents and, specifically, about whether they were injured and what parts of their bodies were involved in the assault. Both of the girls were told the purpose of the examination was to determine if they had been "hurt," so their motives in making the statements were certainly consistent with the purposes of promoting treatment or diagnosis of a medical condition. Additionally, the content of the statements were reasonably relied on by a medical provider in the

39

treatment or diagnosis of the children's medical conditions. Although the statements may have had the incidental effect of developing criminal forensic evidence, as in *McLaury,* the nurse's testimony fell within the exception.

[¶120]   The nurse practitioner's account of foster mother TP's statements about the children's reports is more problematic. She recounted to the jury what TP told her about the children's reports of abuse. Defense counsel objected to this testimony as double hearsay, but the State explained it was not offering it to prove the truth of the matter asserted but to explain what the nurse did in response to the reports. The district court allowed the testimony for that purpose and instructed the jury it was not admitted to prove the truth of the children's statements.

[¶121]   As defense counsel noted at trial, the statements were double hearsay, or hearsay within hearsay. W.R.E. 805 states: "Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." In other words for double hearsay to be admissible, each level of hearsay must be admissible. The district court allowed the testimony on the grounds that it was not offered for the truth of the matter asserted but to show how the nurse focused her examination, and specifically instructed the jury as to the limited purpose of the testimony.

[¶122]   The foster mother's account of the children's statements was the first level of hearsay. This situation invokes the same rules and concerns addressed in our discussion of TP's trial testimony, above. In this instance, the district court properly instructed the jury of the limited purpose of the testimony. However, the nurse testified about the details of the children's reports to TP, including the number of times the abuse occurred. As we explained, *supra,* the rule which permits such testimony to be admitted to show its effect on the hearer, i.e., how the nurse focused her examination, only allows admission of the basic facts necessary for that purpose. It does not allow a detailed rendition of the declarants' statements. The district court, therefore, improperly allowed the nurse to give a detailed account of TP's report of the children's statements.

E.   Harm

[¶123]   To summarize, the district court mistakenly allowed: 1) TP to recount the children's statements in detail at trial; and 2) the nurse practitioner to testify in detail about what TP told her the children had reported. We, therefore, consider the harm resulting from these errors. Whether our review is for plain error (when no objection is lodged) or for harmless error (when a proper objection was made), we determine whether the defendant's substantial rights were harmed. W.R.Cr.P. 52; W.R.A.P. 9.04 and 9.05; *O'Brien v. State,* 2002 WY 63, ¶ 35, 45 P.3d 225, 236-37 (Wyo. 2002). In order to show

a defendant's substantial rights were affected warranting reversal, a reasonable probability must exist, based on the whole record, that the verdict would have been more favorable to him if the error had not been committed. *See McGinn v. State,* 2015 WY 140, ¶ 13, 361 P.3d 295, 299 (Wyo. 2015); *White v. State,* 2003 WY 163, ¶ 7, 80 P.3d 642, 646 (Wyo. 2003).

[¶124] We stated in *Lancaster,* ¶ 29, 43 P.3d at 93, that an error in admission of hearsay is not harmful if the evidence was "merely cumulative" of other evidence showing the defendant's guilt. *See also Curl,* 898 P.2d at 374 (stating "[e]rror, if any, may be considered harmless when the content of the challenged consistent statements is clearly cumulative of prior testimony"); *State v. Bauman,* 779 P.2d 185, 187-88 (Or. Ct App. 1989) (ruling the error in admitting mother's account of victim's statement was harmless because victim actually testified in court to the same information).

[¶125] The inadmissible evidence here was merely cumulative of the other appropriate evidence of Mr. Griggs' guilt. CM described Mr. Griggs' abuse of her in detail, including both cunnilingus and intrusion of her anal opening by his penis. She also testified that Mr. Griggs' did the same things to SM. JM was an eyewitness to the abuse and confirmed many aspects of CM's testimony. He testified that Mr. Griggs touched both of his sisters in their "private spots" with his "private spot," which he identified in the demonstration by the prosecutor as being the pelvic area. In addition, the forensic interviewer properly recounted CM's and JM's statements, and the nurse practitioner testified about both girls' explanations of the abuse during her examinations.

[¶126] Consequently, the errors in admitting TP's testimony and the nurse's recitation of TP's account of the children's statements did not affect Mr. Griggs' substantial rights. The admissible evidence supports Mr. Griggs' convictions and the inadmissible testimony was merely cumulative. There is no reasonable probability that, without the improperly admitted evidence, the verdict would have been more favorable to Mr. Griggs.

### VI.   Other Bad Acts Evidence under W.R.E. 404(b)

[¶127] Wyoming has a well-developed process for determining the admissibility of other bad acts evidence under Wyoming Rule of Evidence 404(b):

> (b) *Other crimes, wrongs, or acts***.** – Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent,

preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

[¶128]   When a defendant files a pretrial demand for notice from the State of its intent to introduce evidence under W.R.E. 404(b), the demand is treated as a timely objection to the introduction of the evidence.  *Howard v. State,* 2002 WY 40, ¶ 23, 42 P.3d 483, 491 (Wyo. 2002).    Prior misconduct evidence carries an inherent danger for prejudice; consequently, we require district courts to follow a mandatory procedure for testing its admissibility:

> (1)  the evidence must be offered for a proper purpose; (2) the evidence must be relevant; (3) the probative value of the evidence must not be substantially outweighed by its potential for unfair prejudice; and (4) upon request, the trial court must instruct the jury that the similar acts evidence is to be considered only for the proper purpose for which it was admitted.  *Vigil,* 926 P.2d at 357 (*quoting United States v. Herndon,* 982 F.2d 1411, 1414 (10th Cir.1992)).

*Gleason v. State,* 2002 WY 161, ¶ 18, 57 P.3d 332, 340 (Wyo. 2002).  The *Gleason/Vigil* test is intended to be conducted by the trial court; consequently, we do not apply it *de novo* on appeal.  Our role is to determine whether admission of the evidence was error. *Hodge v. State,* 2015 WY 103, ¶ 8, 355 P.3d 368, 370 (Wyo. 2015).

[¶129]   We review the district court's decision for an abuse of discretion.  "A trial court abuses its discretion when it could not have reasonably concluded as it did."  *Bromley v. State,* 2007 WY 20, ¶ 8, 150 P.3d 1202, 1206–07 (Wyo. 2007).  Under that standard, "as long as there exists a legitimate basis for the trial court's ruling, that ruling will not be disturbed on appeal."  *Cardenas,* 2014 WY 92, ¶ 7, 330 P.3d 808, 810 (Wyo. 2014), quoting *Gonzalez–Ochoa v. State,* 2014 WY 14, ¶ 11, 317 P.3d 599, 603 (Wyo. 2014) (other citations omitted).

[¶130]   The State filed notice that it intended to introduce several of Mr. Griggs' prior bad acts at trial.  The district court held a *Gleason* hearing and ruled evidence about Mr. Grigg's prior conviction for attempted second degree sexual assault of a minor was admissible under W.R.E. 404(b).  At trial, a former DCI agent testified that, in 2003, he posed in an on-line chat room as a mother who was willing to "share" her two daughters,

ages seven and ten, for sexual acts. Mr. Griggs contacted the detective and they made arrangements to meet so he could have sex with the two young girls. He specifically described the sexual acts he wanted to perform on the two girls. Mr. Griggs traveled from Rock Springs to Cheyenne, where law enforcement arrested him.

[¶131] The district court admitted the evidence of Mr. Griggs' prior bad act for the purpose of showing his motive to sexually abuse children. He does not contest that aspect of the district court's decision and our precedent supports use of such evidence for that purpose. *See, e.g., Gleason, supra; Snyder v. State,* 2015 WY 91, ¶ 15, 353 P.3d 693, 695-96 (Wyo. 2015); *Brower v. State,* 1 P.3d 1210, 1214 (Wyo. 2000). Mr. Griggs' argument on appeal focuses on the prejudicial effect of the evidence of his prior conviction. One of the elements of our mandatory test is "the probative value of the evidence must not be substantially outweighed by its potential for unfair prejudice." *Gleason,* ¶ 18, 57 P.3d at 340. In *Gleason,* we required trial courts to consider specific factors when balancing probative value versus unfair prejudice.

> In determining the probative value of prior bad acts evidence, the trial court should consider the following factors:
>
> 1. How clear is it that the defendant committed the prior bad act?
> 2. Does the defendant dispute the issue on which the state is offering the prior bad acts evidence?
> 3. Is other evidence available?
> 4. Is the evidence unnecessarily cumulative?
> 5. How much time has elapsed between the charged crime and the prior bad act?
>
> . . .The trial court should [then] weigh [the following] factors against the probative value of the evidence:
>
> 1. The reprehensible nature of the prior bad act. The more reprehensible the act, the more likely the jury will be tempted to punish the defendant for the prior act.
> 2. The sympathetic character of the alleged victim of the prior bad act. Again, the jury will be tempted to punish the defendant for the prior act if the victim was especially vulnerable.
> 3. The similarity between the charged crime and the prior bad act. The more similar the acts, the greater is the

likelihood that the jury will draw the improper inference that if the defendant did it once, he probably did it again.

4. The comparative enormity of the charged crime and the prior bad act. When the prior act is a more serious offense than the charged crime, the introduction of that act will tend to place the defendant in a different and unfavorable light.

5. The comparable relevance of the prior bad act to the proper and forbidden inferences. Evidence of the prior bad act may be much more probative of bad character than it is of any legitimate inference permitted by Rule 404(b).

6. Whether the prior act resulted in a conviction. The jury may be tempted to punish the defendant if they believe he escaped punishment for the prior bad act.

*Id.* at ¶ 27, 57 P.3d at 342–43. The trial court is not required to make express findings on each factor; however, it must provide an adequate record for this Court's review. *Id.* at ¶ 28, 57 P.3d at 343.

[¶132] The district court in the case at bar did a full *Gleason* analysis, including scrutinizing the factors for comparing the probative value and the prejudicial effect of the evidence. It concluded that, while prejudicial, the probative value of the evidence—to show Mr. Griggs' motive to have sex with young girls—outweighed the risk of unfair prejudice. Mr. Griggs does not point out any specific error in the district court's analysis. Instead, he focuses on the prosecutor's use of the prior conviction evidence in her rebuttal closing argument. In order to fully understand Mr. Grigg's argument, we need to provide some context. Prior to the closing arguments, the district court specifically instructed the jury regarding the prior bad acts evidence in Instruction No. 14:

You heard a certain category of evidence called "other acts evidence." In this case, the evidence was that in 2003, the [D]efendant was investigated for and pleaded guilty to the charge of attempted sexual assault in the second degree.

You may not convict a person simply because you believe he committed other acts in the past. The Defendant is on trial only for the crimes charged, and you may consider the evidence of prior acts only on the issue of motive.

[¶133] After defense counsel finished his closing argument, the prosecutor indicated that she wanted to use a power point presentation in her rebuttal argument. Defense counsel objected and expressed concern about the State bringing up the evidence of the 2003 conviction when it was not mentioned in either of the parties' initial closing arguments.

The prosecutor stated that she intended to discuss the evidence in rebuttal because defense counsel had opened the door. The district court reviewed the transcript and found two instances where defense counsel mentioned Mr. Grigg's lack of motive to abuse children. Consequently, the district court ruled that the State could discuss the 2003 conviction in rebuttal but stated that defense counsel could address the jury on the matter.

[¶134] Prior to the State's rebuttal argument, defense counsel was allowed to reopen his closing argument to address the prior bad acts evidence. He explained to the jury that Mr. Griggs was only eighteen years old at the time of the prior bad act and that it had occurred nearly ten years before. Defense counsel reminded the jury it could not convict Mr. Griggs of the current charges simply because he had committed the earlier crime and the evidence of the earlier conviction could only be used for the purpose of showing motive.

[¶135] The prosecutor then addressed the 2003 conviction in her rebuttal argument as follows:

> I want to talk to you about motive. [Defense counsel] was talking to you about the 2003 case. Byron Griggs had motive. I will agree with [defense counsel], we cannot use the 2003 evidence to prove that it – Mr. Griggs did something similar in 2003, it proves that he did it this time. That's not what the State is using the evidence for.
>
> What we are using it for is to show what Mr. Griggs' motive is. To show you, there is evidence, in addition to what the children have told you, why would Mr. Griggs do this? This is his motive. This is actually what he has told you from the 2003 chat, what [the DCI agent] was talking about.

The prosecutor went on to describe Mr. Griggs statements in the chat, which included that he wanted to have various types of sex with "little preteen girls."

[¶136] Although Mr. Griggs argues the evidence was very prejudicial, he does not challenge the district court's findings on the various *Gleason* factors. He also does not argue specifically that the district court erred by allowing the State to discuss the 2003 conviction in its rebuttal closing argument. He simply claims the State's argument prejudiced him because the jury may have used the 404(b) evidence improperly. Given the district court instructed the jury on the proper use of the evidence, gave Mr. Griggs the opportunity to specifically address the evidence prior to the State's rebuttal, both defense counsel and the prosecutor emphasized the proper use of the evidence, and

defense counsel specifically referred the jury to Instruction No. 14 which warned against using the evidence improperly, Mr. Griggs has failed to show any error under W.R.E. 404(b).

[¶137] Affirmed.