2018 WY 12

**Jonathon Kent MOSER, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

S-17-0106

Supreme Court of Wyoming.

February 7, 2018

Representing Appellant: Office of the State Public Defender: Diane Lozano, State Public Defender; Tina N. Olson; Chief Appellate Counsel; Eric M. Alden, Senior Assistant Appellate Counsel; David E. Westling, Senior Assistant Appellate Counsel. Argument by Mr. Westling.

Representing Appellee: Peter K. Michael, Wyoming Attorney General; Christyne Martens, Senior Assistant Attorney General; and Katherine A. Adams, Assistant Attorney General. Argument by Ms. Adams.

Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.

HILL, Justice.

[¶1] Following a jury trial, Jonathon Moser was convicted of three counts of second degree sexual assault of a minor and one count of first degree sexual assault of a minor. Mr. Moser claims the district court abused its discretion in admitting other acts evidence under W.R.E. 404(b) and in applying the rape shield statute to limit cross-examination of one of the victims. We affirm.

## ISSUES

[¶2] Mr. Moser presents two issues on appeal, which he states as follows:

I. Did the trial court abuse its discretion by allowing the testimony of P.S., J.G., K.J., and A.R. in violation of Rule 404(b)?

II. Did the trial court abuse its discretion by prohibiting Mr. Moser from cross-examining A.C. on her prior experience as a complaining victim?

## FACTS

[¶3] In 2014, the Rawlins Middle School in Rawlins, Wyoming hired Jonathon Moser as a 7th grade special education teacher for the 2014-2015 school year. In that capacity he was assigned any 7th grade student who had been placed on an individual education program (IEP). Mr. Moser also had volunteer duties, which are extra duties assigned on a volunteer basis and for which a teacher does not receive any additional compensation. Mr. Moser's volunteer duties were assisting with the middle school volleyball program and supervising the tardy detention program.[1]

[¶4] During the 2014-2015 school year, AC was in the 8th grade at the Rawlins Middle School. She was thirteen years old when the school year began and turned fourteen in October 2014. AC was also on a diversion program, which is a program "where juveniles who are getting in trouble for the first time with law enforcement have an opportunity to do a precourt and an unofficial proba-

tion." AC was on the program for a shoplifting charge and was required through the program to meet with a diversion and probation officer.

[¶5] In February 2015, during a meeting with her probation officer, AC disclosed that on an occasion when she was serving a tardy detention under Mr. Moser's supervision, he required her to sit next to him at his desk and he rubbed her leg and tried to hold her hand. AC described what happened on that occasion with Mr. Moser:

Q. And can you describe for the jury exactly what he was doing with his hand on your leg? When you say "rubbing," you've got to describe it in detail.

A. I don't know. He was—just, like, had his hand rubbing up and down my leg.

\* \* \*

Q. Where were your hands at, [AC]?

A. In my lap.

Q. And at any point, did Mr. Moser try to touch your hands?

A. Yes.

Q. And can you tell me about that?

A. My hands were, like, folded in my lap, like how they always are. And he would, like, put his hand on top of mine, like that, and would try holding it, but I pulled away.

Q. What did you do when he was touching your leg?

A. I started to, like, move away.

Q. Did he say anything to you as you moved away from him?

A. He told me that—like, as I was moving away, that if I moved, I was going to get another day of detention.

Q. Did you get assigned another day of detention?

A. Yes.

[¶6] In response to the report from AC, AC's probation officer, who was herself a deputy sheriff, contacted the Carbon County Sheriff's Office. Sheriff's Deputy Tom Lakia

---

1. The Rawlins Middle School was trying to reduce student tardiness by requiring students to serve a thirty-minute after-school detention each time they reached five "tardies." Students served those detentions in Mr. Moser's room and were required to sit quietly for thirty minutes. In hopes that the program would act as a deterrent, students were not permitted to bring any materials to the room and were not permitted to do homework.

responded to that call and spoke with AC and her father and then interviewed AC. Following his interview of AC, Deputy Lakia interviewed several other students identified by AC as possibly having additional information. Through those additional interviews, Deputy Lakia "learned just a little bit of further inappropriate touching with at least two more students," but none of the interviews revealed touching of genitalia. The touching that was reported involved students who served detentions, participated in volleyball, or both.

[¶7] Deputy Lakia prepared a report on his findings, and after discussions with school officials and the county attorney's office, the decision was made that there was insufficient evidence to pursue criminal charges against Mr. Moser. It is not clear from the record whether Mr. Moser's 2014-2015 contract with the Rawlins Middle School was terminated or he was placed on administrative leave for the remainder of his contract, but he did leave the school following the investigation into the allegations of inappropriate touching.

[¶8] In the spring of 2015, the Glenrock High School in Glenrock, Wyoming hired Mr. Moser to fill a special education position which placed him in charge of two severely disabled students. Mr. Moser's duties also included assisting the school's other two special education teachers as needed and essentially working as a team in the special education department. Mr. Moser and the high school's principal, Chris Gray, discussed the possibility of Mr. Moser serving as an assistant freshman volleyball coach, but they never got beyond discussing the idea.

[¶9] In January 2016, Principal Gray was visited by JB, a student in the high school's 9th grade, along with her mother and grandmother. JB reported that on the prior Friday, she attended a session of Academic Plus for one of her classes.[2] JB reported that her teacher was in and out of the room during the session and on one occasion when her teacher was out of the room, Mr. Moser entered the room, started rubbing her shoul-

ders, and told her when she was done she could come to his classroom. When JB completed her Academic Plus session, she left the room and headed to her locker, which required that she pass Mr. Moser's room.

[¶10] JB reported that when she passed Mr. Moser's room, he was seated in the entry alcove reading a book and he stood up and said "hi" to JB. He then started kissing her and pulled her into his classroom and pressed her against a countertop in the room. Mr. Moser "started to dry hump" JB and touched her breasts and vagina above her clothing. JB described what happened next:

Q. How long did this go on for?

A. I don't know. A couple of minutes.

Q. Were you and Mr. Moser—were you talking at all during this time?

A. No.

Q. Did you say anything to him as this happened?

A. I just told him that I needed to leave because my mom was downstairs waiting for me.

Q. Was your mom downstairs waiting for you?

A. No. My brother was downstairs waiting for me.

Q. Why did you say your mom was downstairs waiting?

A. I don't know.

Q. Did Mr. Moser say anything back to you?

A. He asked me if there was anything he could do to make me stay.

Q. What did you tell him?

A. I told him, no, that I needed to leave.

Q. Did you leave at that time?

A. Yes.

Q. Where did you go?

A. I went downstairs and I got in the truck with my brother and went home.

Q. [JB], did you tell anyone right away?

A. No.

**2.** Fridays at the Glenrock High School are half days. Academic Plus is a program whereby students who are failing a class will attend that class on Friday afternoons to work on improving

their grade in that class. According to JB, Mr. Moser asked JB if she had to attend Academic Plus and she informed him that she did and in whose classroom she had to attend.

Q. Why not?

A. Because I was scared.

Q. What were you scared of?

A. I don't know.

Q. When did you tell someone?

A. The Monday after it happened.

Q. Can you explain to us how that came about that you told someone?

A. I saw him in his classroom before— or, like, right when school started, and he just waved at me. And I just had a mental breakdown, and I went to the bathroom and I called my mom and told her she needed to come get me.

[¶11] Principal Gray reported the incident to law enforcement, and Officer Felton of the Glenrock Police Department responded to the call. During the course of his investigation, Officer Felton located two additional students with similar reports, and he also learned of the earlier Rawlins Middle School investigation. Officer Felton contacted Deputy Lakia in January 2016 to discuss the Rawlins investigation, and Deputy Lakia decided to re-interview the Rawlins witnesses.

[¶12] Officer Felton and a deputy from the Converse County Sheriff's Office, Deputy Koss, traveled to Rawlins, and together with Deputy Lakia they re-interviewed the Rawlins witnesses. During their first interview of AC, which occurred in January 2016, AC reported the same incident of touching she had reported in her 2015 interview. In a subsequent interview about a week and a half to two weeks later, in February 2016, AC reported an additional incident in which Mr. Moser forced her to have sexual intercourse. AC described that incident:

Q. Okay. So let's talk about the third time you get called down. Did you get called to the office?

A. Yes.

Q. Did you have to go serve detention with Mr. Moser?

A. Yes.

Q. Were there any other kids that day?

A. They called a couple, but no one else showed up.

Q. Did you end up going to Mr. Moser's room for detention?

A. Yes.

Q. Where did you go when you got to the room?

A. To where I normally sat, on the side of the tables, on the right side.

Q. And was the door to the classroom open or closed that day?

A. That day, it was completely closed.

Q. The other days that you served detention, was the classroom door open or closed?

A. It was a little bit open, propped open by a doorstop.

Q. On both of the other days?

A. Yes.

Q. Where did Mr. Moser sit when you got to detention?

A. He grabbed his papers and came over and sat—like, because there's separate tables—he sat at this one, and I was at this one. So it was, like, kind of by me.

Q. Did you guys talk at all during detention?

A. No.

Q. Did he say anything to you?

A. Yes.

Q. What did he say to you?

A. He kept asking my why I was scared.

Q. Did you act like you were scared?

A. I didn't think I was, but I don't know.

Q. Were you scared that day?

A. A little bit, yeah.

Q. What were you scared of?

A. I don't know. I was just really uncomfortable being in there by myself.

Q. Did anything happen when you were in that classroom that day?

A. Yes.

Q. Can you describe what happened?

A. He, like, kept asking me if I was scared, and I just kind of ignored him. And he got up and was, like, moving my hair and telling me that I had nothing to worry about.

And he started—like, he was trying to kiss me. And I was, like—kept trying to

move away. And he was kissing me and stuff and ended up taking off my shirt. And I kind of just, like, froze and let it happen. And he took off my shirt and my bra. And I was standing at this point. And I was, like, up against the table, and he was unbuttoning my pants and taking them off.

Q. Was there anyone around at that time other than you and Mr. Moser?

A. No.

Q. Can you describe what happened next?

A. He took my pants off, and they were, like, on the floor. And he put me up on the desk and unbuttoned his pants and had intercourse with me.

[¶13] During their January 2016 interviews, Deputy Lakia, Officer Felton, and Deputy Koss also interviewed other students, including MG. MG was fourteen years old and in the 8th grade at Rawlins Middle School when she encountered Mr. Moser. MG reported three incidents involving Mr. Moser, two that occurred in relation to her volleyball activities and one that occurred when she served a detention under Mr. Moser's supervision.

[¶14] The first incident occurred during a volleyball practice, when MG was warming up in a back gym. MG reported that Mr. Moser called her over to where he was standing alone by the locker room doors and grabbed her breast over her clothing. MG pushed him away and went to the front gym. The second incident occurred on a bus when the volleyball players were returning from an out-of-town tournament. MG reported she was seated in the back of the bus with a blanket over her lap and Mr. Moser sat next to her and rubbed her thigh and vagina over her clothing until she pushed his hand away. The third incident occurred during a detention supervised by Mr. Moser. MG reported that Mr. Moser came and sat next to MG and again rubbed her thigh and vagina over her clothing until she pushed his hand away.

[¶15] On January 29, 2016, the State, through the county attorney for Carbon County, filed an information charging Mr. Moser with three counts of second degree

sexual abuse of a minor in relation to the three alleged incidents of sexual contact with MG at the Rawlins Middle School. On February 5, 2016, the State filed an amended information, which added a fourth count charging Mr. Moser with first degree sexual abuse of a minor in relation to the alleged incident of sexual intrusion with AC at the Rawlins Middle School.

[¶16] On March 28, 2016, Mr. Moser filed a demand for notice of the State's intent to use 404(b) evidence. On May 4, 2016, the State filed its notice of intent to use 404(b) evidence and identified that evidence as follows:

1. A.R. gets a "weird" feeling when Mr. Moser is around. A.R. has had Mr. Moser put his hands under her breasts when he hugs her. A.R. stated he hugs all of the team members this way and believes most of the girls are scared of him. A.R. further stated Mr. Moser had sat next to her and placed his hand on her leg very close to her genital area and caressed her by running his thumb and forefinger in a circular pattern on her upper thigh.

2. J.G. believes Mr. Moser is "weird" and stated that he touched her buttocks during volleyball practice in August or early September. J.G. stated she walked away afterwards but then Mr. Moser walked up to her and put his arm around her. J.G. told Mr. Moser not to touch her. J.G. demonstrated how she was touched on the buttocks. Mr. Moser placed his hand on her lower back and then ran his hand over her buttocks down to her thigh.

3. K.J. says Mr. Moser is "weird" and that once he brushed his hand on her while she was practicing serving in volleyball. K.J. demonstrated the manner in which he did this. Mr. Moser placed his hand on her lower back and ran his hand over her buttocks and down to her thigh. K.J. expressed concern that she was not certain if he would have stopped.

4. P.S. said Mr. Moser would come to her classes and sit next to her and make him hold her hand. Mr. Moser would walk with P.S. to her next class holding her hand. P.S. stated Mr. Moser also touched P.S. on the buttocks when she bent over to pick up a book. P.S. told him to stop, and Mr.

Moser told her to "stop telling him what to do". P.S. also said Mr. Moser rubbed her legs.

5.  M.M. said Mr. Moser came in to one of her classes while they were watching a video and ran his hand across her lower back by her buttocks. When she turned around she was told to turn around and watch the movie.

6.  K.M. stated Mr. Moser ran his hand across her back 2-3 times. K.M.(2) told the principal about the touching and it has not happened since. K.M.(2) also stated from then on Mr. Moser was not left alone with the class and either another teacher or teacher's aide was present at all times.

7.  S.Y. described an incident when she had asked Mr. Moser for help in a class he taught and he rubbed her leg and put his arm around her. S.Y. notified the principal of this touching and from then on she noticed Mr. Moser was not left alone in her classroom with students.

8.  J.B. stated that on the 8th day of January 2016, Mr. Moser touched her breast and vagina with his hands and rubbed his penis against her body. This conduct has been charged in Converse County, Wyoming.

9.  B.P. stated that between October and November of 2015, Mr. Moser touched her vagina. This conduct has been charged in Converse County, Wyoming.

10.  C.S. stated that between November and December 2015, Mr. Moser touched her vagina. This conduct has been charged in Converse County, Wyoming.

[¶17] The State contended the 404(b) evidence was relevant to show motive, plan/modus operandi, and course of conduct and was thus offered for proper purposes under W.R.E. 404(b). Mr. Moser objected to the evidence as improper propensity evidence. The district court held a hearing on the 404(b) evidence, and on June 15, 2016, it issued an eight-page order, which allowed some of the evidence and excluded some of the evidence. With respect to the evidence the court ruled admissible, the court agreed with the State that the evidence was relevant to show motive, plan/modus operandi, and course of conduct.

[¶18] A three-day jury trial began on July 19, 2016. On the first day of trial, defense counsel informed the district court that he had just learned that AC was a victim in another sexual assault that had resulted in a conviction. Defense counsel requested permission to cross-examine AC on the earlier assault and conviction as a means to impeach AC's claim that she did not report Mr. Moser's alleged assault because she was afraid. The court took the matter under advisement, and on the second day of trial, it held a rape shield hearing. After hearing argument, the court denied the requested cross-examination of AC on her status as a victim in the prior sexual assault conviction on the basis that the evidence was inadmissible under the rape shield statute.

[¶19] On July 21, 2016, the jury returned a verdict finding Mr. Moser guilty on the four counts charged. On January 10, 2017, the district court sentenced Mr. Moser to three concurrent prison terms of sixteen to twenty years for the second degree sexual abuse convictions, and a consecutive term of twenty to thirty-five years for the first degree sexual abuse conviction. Mr. Moser filed a timely notice of appeal to this Court.

## DISCUSSION

[¶20] We will address first Mr. Moser's claim that the district court abused its discretion in admitting uncharged acts evidence under Rule 404(b). We will then turn to his claim that the court abused its discretion in restricting his cross-examination of AC on her status as a victim in a prior sexual abuse case.

### A.  404(b) Evidence

### 1.  Required Rule 404(b) Analysis

[¶21] We have recognized that other acts evidence carries an "inherent danger for prejudice." *Griggs v. State*, 2016 WY 16, ¶ 128, 367 P.3d 1108, 1143 (Wyo. 2016). A trial court is therefore required to follow a mandatory procedure for testing its admissibility:

(1) the evidence must be offered for a proper purpose;  (2) the evidence must be

relevant; (3) the probative value of the evidence must not be substantially outweighed by its potential for unfair prejudice; and (4) upon request, the trial court must instruct the jury that the similar acts evidence is to be considered only for the proper purpose for which it was admitted. *Vigil* [*v. State*], 926 P.2d [351] at 357 [(Wyo. 1996)] (quoting *United States v. Herndon*, 982 F.2d 1411, 1414 (10th Cir. 1992)).

*Griggs*, ¶ 128, 367 P.3d at 1143 (quoting *Gleason v. State*, 2002 WY 161, ¶ 18, 57 P.3d 332, 340 (Wyo. 2002)).

[¶22] In determining the probative value of 404(b) evidence and weighing that against its potential for unfair prejudice, a trial court is to consider the following factors:

In determining the probative value of prior bad acts evidence, the trial court should consider the following factors:

1. How clear is it that the defendant committed the prior bad act?

2. Does the defendant dispute the issue on which the state is offering the prior bad acts evidence?

3. Is other evidence available?

4. Is the evidence unnecessarily cumulative?

5. How much time has elapsed between the charged crime and the prior bad act?

... The trial court should [then] weigh [the following] factors against the probative value of the evidence:

1. The reprehensible nature of the prior bad act. The more reprehensible the act, the more likely the jury will be tempted to punish the defendant for the prior act.

2. The sympathetic character of the alleged victim of the prior bad act. Again, the jury will be tempted to punish the defendant for the prior act if the victim was especially vulnerable.

3. The similarity between the charged crime and the prior bad act. The more similar the acts, the greater is the likelihood that the jury will draw the improper inference that if the defendant did it once, he probably did it again.

4. The comparative enormity of the charged crime and the prior bad act. When the prior act is a more serious offense than the charged crime, the introduction of that act will tend to place the defendant in a different and unfavorable light.

5. The comparable relevance of the prior bad act to the proper and forbidden inferences. Evidence of the prior bad act may be much more probative of bad character than it is of any legitimate inference permitted by Rule 404(b). 6. Whether the prior act resulted in a conviction. The jury may be tempted to punish the defendant if they believe he escaped punishment for the prior bad act.

*Griggs*, ¶ 131, 367 P.3d at 1144 (quoting *Gleason*, ¶ 27, 57 P.3d at 342-43).

[¶23] "The trial court is not required to make express findings on each factor; however, it must provide an adequate record for this Court's review." *Griggs*, ¶ 131, 367 P.3d at 1144 (quoting *Gleason*, ¶ 28, 57 P.3d at 343).

## 2. Standard of Review

[¶24] With respect to this Court's review of a district court's application of the required Rule 404(b) analysis and its admissibility ruling, we have said:

"Our task in reviewing a district court's decision on the admissibility of uncharged misconduct evidence is to determine whether the district court abused its discretion, not to apply the *Gleason/Vigil* test anew." *Rolle v. State*, 2010 WY 100, ¶ 17, 236 P.3d 259, 269 (Wyo. 2010), *overruled in part on other grounds by Johnson v. State*, 2015 WY 118, 356 P.3d 767 (Wyo. 2015) (citing *Gleason*, 2002 WY 161, ¶ 18, 57 P.3d at 340 ("We do not apply this test on appeal; rather, it is intended to be conducted by the trial court.")). Under an abuse of discretion standard, we give the trial court's ruling considerable deference and if "there exists a legitimate basis for the trial court's ruling, that ruling will not be disturbed on appeal." *Hodge* [*v. State*], 2015 WY 103, ¶ 8, 355 P.3d [368] at 371 [(Wyo. 2015)] (internal quotation marks omitted). However, if the trial court could not have reasonably concluded as it did, we will find an abuse of discretion. *Bromley v.*

*State,* 2007 WY 20, ¶ 8, 150 P.3d 1202, 1206-07 (Wyo. 2007). "In this context, 'reasonably' means sound judgment exercised with regard to what is right under the circumstances and without being arbitrary or capricious." *Id.*

*Garrison v. State,* 2018 WY 9, ¶ 20, 409 P.3d 1209 (Wyo. 2018).

### 3. District Court's Rule 404(b) Ruling

[¶25] The district court's eight-page order addressing the proffered Rule 404(b) evidence set forth the required *Gleason* analysis. Although the court did not make express findings on each *Gleason* factor, the court's ruling reflects a careful consideration of the required analysis. The result of that analysis was an order excluding some of the State's proffered evidence, while allowing the evidence that the court found warranted by its analysis.

[¶26] The district court excluded all testimony that Mr. Moser is "weird," that a witness "gets a 'weird' feeling when Mr. Moser is around," that Mr. Moser hugs all of the volleyball team members, or that "most of the girls are scared of him." The court also excluded testimony concerning uncharged acts that the court found too general, vague, prejudicial and cumulative. The testimony concerning uncharged conduct the court did admit was described by the court as:

a. A.R.'s statement that "Mr. Moser had sat next to her and placed his hand on her leg very close to her genital area and caressed her by running his thumb and forefinger in a circular pattern on her upper thigh."

b. J.G.'s statement that Mr. Moser "touched her buttocks during volleyball practice in August or early September[,] [that] she walked away afterwards but then Mr. Moser walked up to her and put his arm around her. * * *"

c. K.J.'s statement that "once [Mr. Moser] brushed his hand on her while she was

practicing serving in volleyball. [She] demonstrated the manner in which he did this. Mr. Moser placed his hand on her lower back and ran his hand over her buttocks down to her thigh."

d. P.S.'s statement that "Mr. Moser would come to her classes and sit next to her and make [her] hold [his] hand. Mr. Moser would walk with [her] to her next class while holding her hand." P.S.'s statement that Mr. Moser also touched [her] on the buttocks when she bent over to pick up a book. [She] told [him] to stop, and [he] told her to "stop telling [me] what to do[.]" P.S. also [stated] that Mr. Moser rubbed her legs.

[¶27] In ruling this testimony admissible, the district court reasoned:

The foregoing evidence is relevant to the crimes charged, as it demonstrates the course of conduct between Mr. Moser and his students, and provides a context as to whether touching was "innocuous", as claimed by Mr. Moser, or a pattern or course of conduct of inappropriate touching. The evidence occurred within close proximity to the charged acts, "[t]his is not bad-acts evidence of unrelated events." *Scadden v. State,* 732 P.2d 1036, 1043-44 (Wyo. 1987). Moreover, it is not unnecessarily cumulative, but simply shows a pattern of behavior. The evidence is not reprehensible in nature or a more serious offense compared to the charged acts, the evidence establishes that Mr. Moser occupied a position of authority and the relationship he had with his student athletes. *Scadden v. State,* 732 P.2d 1036, 1043-44 (Wyo. 1987).

[¶28] Mr. Moser contends that the district court abused its discretion in admitting the uncharged acts evidence because the evidence was not relevant and was unfairly prejudicial.[3] Specifically, Mr. Moser contends: 1) the conduct about which the wit-

---

3. The court also admitted the testimony of three witnesses concerning the acts charged in Converse County, but Mr. Moser does not challenge that decision on appeal. The court summarized that evidence as:

a statement from J.B. that on January 8, 2016, Mr. Moser touched her breast and vagina with his hand and rubbed his penis against her body; a statement from B.P. that between October and November 2015, Mr. Moser touched her vagina; and a statement from C.S. that between November and December 2015, Mr. Moser touched her vagina.

nesses testified was not sexual in nature, so it was not relevant to motive; 2) the conduct about which the witnesses testified was not part of one continuous transaction or story, so it was not relevant to show a course of conduct; and 3) the testimony was unfairly prejudicial because it suggested Mr. Moser's behavior is more extensive than charged and was aimed at encouraging the jury to find "there is a whole lot of touching going on, it must be sexual." We disagree and conclude based upon our record review that the district court performed a proper Rule 404(b) analysis and did not abuse its discretion in admitting the uncharged acts evidence.

[¶29] First, with regard to the probative value of the admitted testimony, we reject Mr. Moser's assertion that the acts described in that testimony were not sexual in nature and were instead "all simply incidents of non-sexual touching in the course of [his] professional interactions with the four witnesses." In addressing this contention, we will not set forth each witness' testimony in full, but the following excerpts illustrate the district court did not abuse its discretion in concluding the conduct was relevant to show a sexual motive.

[¶30] PS testified that her encounters with Mr. Moser occurred when she was thirteen years old and in the 7th grade. PS testified that she required some special help in classes and in particular "would get help on questions I didn't understand, and I would get passages that—I would get passages read to me." PS further testified:

Q. While you were in class with Mr. Moser as your special education teacher, did anything unusual ever happen with him?

A. Yes, ma'am. He would try to hold my hand. And he would rub his hand up on—or my inner thigh.

* * *

Q. While you were at that desk, can you tell us what happened, what you were working on, what happened next?

A. I was working on book work, and I needed help on a question. And my teacher, Mr. Grant, was busy, so then Mr. Moser came over and was helping me. And I asked him to explain the question to me, and he explained the question to me, and then he sat right next to me. And he totally made his hand towards mine. And I tried to move it, but it didn't help.

* * *

Q. And did something unusual happen with Mr. Moser? Is that—we are talking about him touching your leg, correct?

A. Yes, ma'am.

Q. And describe what happened.

A. It was a Friday when I was leaving, and we were going to a tournament on Friday. And he sat next to me on my right side. And I asked him to read a passage, and he read the passage and then he just sat there and then slowly made his hand go up my inner thigh.

[¶31] JG was in the 8th grade and on the volleyball team when she encountered Mr. Moser. She testified that during practice she felt something touch her buttocks and turned around to find Mr. Moser behind her. The touch did not feel like a ball or something else brushing by her and instead felt "like finger prints." JG further testified that during that same practice, Mr. Moser put his arm around her, which made her feel uncomfortable, and she told him, "Don't touch me."

[¶32] KJ was also in the 8th grade and on the volleyball team when she encountered Mr. Moser. KJ testified that Mr. Moser was assisting her with her serve and as she held the ball up, he ran his hand down her side to her hip.

Q. And the hand you were using to actually serve the ball would have been your right hand?

A. Yes.

Q. And so you are holding the ball with your left hand. And Mr. Moser didn't help you hit the ball with your right hand; instead, he ran his hand down the left side of your body?

A. Yeah.

Q. And it was your testimony that no other coach has touched you in this way?

A. Yeah.

Q. Would it be accurate that your other coaches were—were helping you with your serve, too?

A. Yeah.

Q. But at no time they would touch your side in order to help you serve?

A. No.

[¶33] AR was thirteen and in the 8th grade when she encountered Mr. Moser. AR was on the volleyball team, and during a team viewing of a movie, Mr. Moser sat next to her. AR testified:

Q. Okay. Did anything unusual happen as Mr. Moser sat next to you?

A. Yes.

Q. Can you describe what happened?

A. He placed his hand on my thigh.

Q. And then what happened?

A. He rubbed circles with his thumb as he moved closer to my crotch.

Q. What did you do when that happened?

A. I asked the other coach if I could go to the bathroom.

Q. Did you get up and leave the room?

A. Yes.

[¶34] Robert Steinberg, the dean of students for the Rawlins Middle School, testified that the school has a no-contact policy between teachers and students.

Q. Do you have any training or policy in the school district about what type of behavior or contact is permissible between a teacher and a student?

A. Yes.

Q. And can you explain that?

A. Basically, it's a no-contact policy, hands off. Simple as that.

Q. So don't touch a student, don't hug a student, don't—

A. Yes.

Q. And don't discipline a student with your hands?

A. Correct. All along those lines, correct.

[¶35] Given this clear policy, Mr. Moser had no reason to touch the students in the manner described in their testimony as part of his "professional interactions" with the students. We have repeatedly held that evidence of other sexual misconduct is relevant and admissible under Rule 404(b) to show a sexual gratification or arousal motive. *Huckfeldt v. State*, 2013 WY 29, ¶ 23, 297 P.3d 97, 103 (Wyo. 2013) (citing *Wease v. State*, 2007 WY 176, ¶ 51, 170 P.3d 94, 110–111 (Wyo. 2007) (citing cases) ). Given the nature of the touching described in the other acts testimony, we find no abuse of discretion in the district court's view that the touching was inappropriate and sexual in nature or in its determination that the evidence was relevant to show motive and intent.[4]

■ [¶36] We likewise find no abuse of discretion in the district court's finding that the evidence was relevant to show a course of conduct. We recently cautioned against relying solely on course of conduct as a basis to admit Rule 404(b) evidence:

We recognize the danger that a course of conduct exception, standing alone, could swallow the general rule against admission of "other crimes, wrongs, or acts," and we emphasize that it must be linked to another legitimate purpose.

*Garrison*, ¶ 29, 409 P.3d at 1217–18.

[¶37] We have no such concern here. First, the district court did not rely solely on the course of conduct exception to admit the other acts evidence. As discussed above, the court also found the evidence relevant for the proper purposes of showing Mr. Moser's motive and intent. Additionally, when the court's ruling is read in context and as a whole, it is clear that the court's reference to "course of conduct" was a reference to Mr. Moser's pattern of conduct and modus operandi—his use of his position of authority to engage in inappropriate touching he found sexually arousing and gratifying. These are proper purposes for admitting the testimony, and the district court did not abuse its discretion in finding the testimony relevant. *Carroll v. State*, 2015 WY 87, ¶ 14, 352 P.3d 251, 255

---

4. To prove second degree sexual abuse of a minor, the State was required to prove sexual contact, which means the touching of intimate parts "with the intention of sexual arousal, gratification or abuse[.]" Wyo. Stat. Ann. § 6-2-301(a)(vi) (LexisNexis 2017); Wyo. Stat. Ann. § 6-2-315(a)(iv) (LexisNexis 2017).

(Wyo. 2015); *Daniel v. State*, 923 P.2d 728, 734 (Wyo. 1996).

██ [¶38] With respect to the weighing of relevance and unfair prejudice, we reject Mr. Moser's argument that the evidence was unfairly prejudicial because it encouraged an impermissible conclusion that "there is a whole lot of touching going on, it must be sexual." Certainly, the testimony showed there was in fact a lot of touching going on. It was not, however, the quantity of touching that made the touching seem sexual in nature. It was the testimony and the context provided by that testimony that showed the touching to be sexual in nature. Additionally, as the district court observed, the conduct to which the witnesses testified was not more serious or reprehensible than the charged conduct, and it was not unnecessarily cumulative because the court culled it to ensure that was the case. Thus, while the evidence was no doubt prejudicial, we find no abuse of discretion in the district court's determination that it was not unfairly prejudicial.[5]

### B. Restrictions on Defense Cross-Examination

[¶39] On the first day of trial, defense counsel notified the district court of his intention to cross-examine AC on her experience with law enforcement in a prior sexual assault case in which she was the victim. His proffered objective was to impeach AC's claim that she delayed reporting Mr. Moser's sexual assault because she was scared, which he proposed to do by showing that law enforcement treated AC fairly and protected her in the prior case. The court found the proposed cross-examination would violate the rape shield statute and ruled that Mr. Moser would not be permitted to cross-examine AC about her prior sexual assault. Mr. Moser claims the court erred in so restricting his cross-examination.

### 1. Standard of Review

██ [¶40] Mr. Moser preserved his objection to the district court's evidentiary rul-

ing, and we therefore review the ruling for an abuse of discretion.

* * * "Evidentiary rulings are ... committed to the sound discretion of the district court and are not subject to appellate second guessing absent an abuse of discretion." *Griggs v. State*, 2016 WY 16, ¶ 81, 367 P.3d 1108, 1132 (Wyo. 2016) (quoting *Lopez v. State*, 2004 WY 103, ¶ 21, 98 P.3d 143, 149 (Wyo. 2004) ). The "abuse of discretion" standard of review requires this Court to consider the reasonableness of the district court's ruling. *Ortiz v. State*, 2014 WY 60, ¶ 92, 326 P.3d 883, 901 (Wyo. 2014); *Schreibvogel v. State*, 2010 WY 45, ¶ 12, 228 P.3d 874, 880 (Wyo. 2010). "Determining whether the trial court abused its discretion involves the consideration of whether the court could reasonably conclude as it did, and whether it acted in an arbitrary and capricious manner." *Lancaster v. State*, 2002 WY 45, ¶ 11, 43 P.3d 80, 87 (Wyo. 2002) (citing *Trujillo v. State*, 2 P.3d 567, 571 (Wyo. 2000) ).

*Triplett v. State*, 2017 WY 148, ¶ 23, 406 P.3d 1257, 1262 (Wyo. 2017).

### 2. Rape Shield Statute

[¶41] The rape shield statute does not prohibit evidence of a victim's sexual history, but it mandates a procedure that must be followed and a showing that must be made if a party seeks to introduce such evidence. It provides, in relevant part:

(a) In any prosecution under this article or for any lesser included offense, if evidence of the prior sexual conduct of the victim, reputation evidence or opinion evidence as to the character of the victim is to be offered the following procedure shall be used:

(i) A written motion shall be made by the defendant to the court at least ten (10) days prior to the trial stating that the defense has an offer of proof of the relevancy of evidence of the sexual con-

---

5. In that regard, we again note that Mr. Moser has not challenged on appeal the district court's decision to admit the testimony of the three witnesses concerning the conduct charged in Converse County. In terms of prejudice, that testi-

mony revealed conduct that was much more reprehensible than the uncharged misconduct testimony of PS, JG, KJ, and AR. In comparison, the prejudicial effect of the testimony challenged on appeal was likely negligible.

duct of the victim and its relevancy to the defense;

(ii) The written motion shall be accompanied by affidavits in which the offer of proof is stated;

(iii) If the court finds the offer of proof sufficient, the court shall order a hearing in chambers, and at the hearing allow the questioning of the victim regarding the offer of proof made by the defendant and other pertinent evidence;

(iv) At the conclusion of the hearing, if the court finds that the probative value of the evidence substantially outweighs the probability that its admission will create prejudice, the evidence shall be admissible pursuant to this section. The court may make an order stating what evidence may be introduced by the defendant, which order may include the nature of the questions to be permitted.

Wyo. Stat. Ann. § 6-2-312 (LexisNexis 2017).

[¶42] Evidence that a sexual assault victim was the complainant in a prior sexual assault complaint or conviction is considered evidence of prior sexual conduct under the rape shield statute. *Johnson v. State*, 806 P.2d 1282, 1288-89 (Wyo. 1991). While the statute is not an absolute bar to such evidence, we have observed that evidence to which the statute applies "is 'generally *not* admissible' in Wyoming." *McGarvey v. State*, 2014 WY 66, ¶ 18, 325 P.3d 450, 456 (Wyo. 2014) (quoting *Stogner v. State*, 792 P.2d 1358, 1362 (Wyo. 1990) ). "[O]nly in the unusual case will the probative value of this kind of evidence substantially outweigh its highly probable prejudicial effect on the victim and the public policy underlying the statute's enactment." *Id.* As to that policy, we have said:

> Wyoming, along with most other jurisdictions, enacted a "rape-shield" statute to bring under control a long-standing tradition that rape victims could be discredited as witnesses based on prior sexual conduct. . . . This tradition was based on the faulty notion that women who engaged in nonmarital intercourse were immoral and likely to engage in such conduct on any given occasion, and was deemed prejudicial and humiliating to the victim. Annotation,

*Constitutionality of "Rape Shield" Statute Restricting Use of Evidence of Victim's Sexual Experiences*, 1 A.L.R.4th 283, 286 (1980).

*Carroll*, ¶ 21, 352 P.3d at 257 (quoting *Stogner*, 792 P.2d 1358, 1362).

### 3. District Court's Rape Shield Ruling

[¶43] Before turning to Mr. Moser's claim, we must first address the State's contention that Mr. Moser's claim should be foreclosed because he did not comply with the rape shield statute's ten-day notice requirement. The State argues the required notice was mandatory and Mr. Moser's failure to provide the notice precluded him from offering evidence of AC's prior sexual conduct and precludes his claim on appeal. To address the State's contention, we must consider the timing of the proceedings below.

[¶44] Defense counsel notified the district court of his intended cross-examination of AC on the first day of trial. When he made that notification, he explained to the court that the State had not disclosed AC's status as a victim in a prior sexual assault and he had only that morning learned of the prior case. The following exchange then occurred between the court and the prosecutor:

> THE COURT: Why didn't you disclose that?
>
> [PROSECUTOR]: Your Honor, I don't think it's exculpatory. I understand he wants to make an argument on it, but it wasn't something we thought was relevant to this case or exculpatory. That issue would never come up.
>
> THE COURT: You made a unilateral decision that that information wasn't exculpatory or important to the Defense? You knew about it and you intentionally failed to disclose it?
>
> [PROSECUTOR]: Yes, Your Honor. That's accurate. We discussed it in our office what would be appropriate—
>
> THE COURT: I find that remarkable.

[¶45] The district court then held a rape shield hearing on the second day of trial, essentially waiving the ten-day notice requirement. At that hearing, the State argued against the admissibility of the evidence, but

it did not object to the hearing itself or to the timing of defense counsel's request. Under these circumstances, and with its brief on appeal being the first time the State has raised the timing question, we decline to consider the State's argument. *See Fowles v. Fowles*, 2017 WY 112, ¶ 28, 402 P.3d 405, 412 (Wyo. 2017) ("We generally do not consider arguments on appeal that were not presented to the district court.").

[¶46] We turn then to Mr. Moser's claim of error. Defense counsel expressed an intention to use AC's prior sexual assault, not to focus attention on her prior sexual activity, but to show that based on her prior experience with law enforcement, she had nothing to fear from reporting Mr. Moser's assault. While this stated purpose does not in itself appear to run afoul of the policy underlying the rape shield statute, we nonetheless find no abuse of discretion in the district court's ruling.

[¶47] Defense counsel cross-examined AC at length concerning her claimed fear of reporting Mr. Moser's sexual assault of her, including the following:

Q. Okay. Now, let me make this clear. You testified here that you were afraid; isn't that right?

A. Yes.

Q. Now, you have talked to law enforcement before?

A. Yes.

Q. You have been interviewed by law enforcement before?

A. Yes.

Q. And you know that they're not going to blame you for this?

A. I wasn't afraid of law enforcement. I was afraid of Mr. Moser.

Q. But—yeah, but you realized that if you reported something like this, he was probably going to get arrested?

A. Yes, but I was still afraid.

Q. So even though you knew if you reported this, he would be arrested, he would be in jail, you were still afraid; is that right?

A. Yes.

\* \* \*

Q. And now, this just—can we agree that you have had significant contacts with police?

A. Yes.

Q. Can we agree that you have never adversely been treated by the police for talking to them?

A. What does that mean?

Q. Well, I mean, you were always encouraged to be candid with the police and you always were when they talked with you and when they interviewed you?

A. Yes.

Q. And you know that the police are here to protect you?

A. Yes.

Q. And you had a probation officer who was a police officer?

A. Yes.

Q. A deputy sheriff, in fact, right?

A. Yes.

Q. And you know that she would have protected you?

A. Yes.

Q. You still didn't disclose?

A. No.

[¶48] Defense counsel was clearly permitted great latitude to question AC about her prior experience with law enforcement. The sole fact omitted from the cross-examination was AC's status as a prior sexual assault victim, and Mr. Moser has not shown how the omission of that evidence impaired his impeachment effort. More importantly, he has not shown that the probative value of the evidence would have outweighed the prejudicial effect on the victim. *See McGarvey*, ¶ 18, 325 P.3d at 456 ("[O]nly in the unusual case will the probative value of this kind of evidence substantially outweigh its highly probable prejudicial effect on the victim and the public policy underlying the statute's enactment."). For these reasons, we find no abuse of discretion in the district court's restriction on Mr. Moser's cross-examination of AC.

## CONCLUSION

[¶49] The district court did not abuse its discretion in admitting 404(b) evidence or in

restricting Mr. Moser's cross-examination of one of the victim's on her history as a sexual assault victim. Affirmed.